# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 1, 2005      Decided February 24, 2006

No. 03-3066

UNITED STATES OF AMERICA,
APPELLEE

V.

NELSON VALDES,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 01cr00154-01)

———

*Paul H. Zukerberg* argued the cause and filed the briefs for appellant.

*Lisa H. Schertler*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Kenneth L. Wainstein*, U.S. Attorney, *John R. Fisher*, Assistant U.S. Attorney at the time the brief was filed, and *Roy W. McLeese, III* and *J. Patrick Rowan*, Assistant U.S. Attorneys.

Before: HENDERSON, *Circuit Judge*, and EDWARDS[*] and WILLIAMS, *Senior Circuit Judges*.

———

[*] Senior Circuit Judge Edwards was in regular service at the time of oral argument.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

Dissenting Opinion filed by *Circuit Judge* HENDERSON.

WILLIAMS, *Senior Circuit Judge*: An FBI informant working undercover gave cash to Nelson Valdes, then a detective with the D.C. Metropolitan Police Department ("MPD"), apparently as a reward for Valdes's searching several police data bases to supply information. (Save for information about the non-existence of an arrest warrant for a fictitious person, the information was, according to uncontradicted testimony, publicly available. Joint Appendix ("J.A.") 659-61, 663-64.) Valdes was convicted under 18 U.S.C. § 201(c)(1)(B) of three counts of receipt of illegal gratuities "for or because of an[] official act." Valdes argues that the statute is far less sweeping than the government successfully claimed in district court, and that under a proper construction the government's evidence was insufficient. He makes a number of other claims, including attacks on two related aspects of the jury instruction and an argument that he was entitled to acquittal as a matter of law on grounds of entrapment. We agree with Valdes that the district court's interpretation of the statute was error and that the government failed to show that the acts for which Valdes received compensation were official acts within the meaning of § 201. We therefore reverse the conviction without reaching Valdes's other claims.

\* \* \*

On the evening of February 17, 2001, William Blake, working as an undercover informant for the FBI, went on assignment to a Washington nightclub called "1223" (located at 1223 Connecticut Avenue, NW). At "1223" Blake was

introduced to Valdes as a judge, and Valdes in turn identified himself as an MPD detective. The two met again at "1223" a week later, on which occasion Valdes gave Blake his business card with his cell phone number, saying it was "just in case [Blake] ever needed a favor."

On March 17, an FBI agent instructed Blake to see if Valdes would provide him with police information. Accordingly, the FBI entered into state computer data bases the names of five fictitious individuals, along with fictitious addresses and license plate numbers. J.A. 361-A-B, 365-67, 371-72. That evening, again at "1223," Blake asked Valdes if he could do him a "favor" of looking up the license plate numbers of some individuals that Blake said owed him money, presumably to track down their contact information. Valdes indicated that it would be "no problem" and told Blake to call him on his cell phone to get the information. On leaving, Blake handed Valdes a $50 bill; no testimony describes the accompanying conversation if any. Four days later, Blake called Valdes, introducing himself as "the judge," reiterated his earlier request and provided Valdes with the first license plate number. Valdes then obtained the name and address of the license holder through a query to the Washington Area Law Enforcement System ("WALES"), a computer data base linked to state data bases. When Blake called back later, Valdes provided him with the name and address. After expressing satisfaction with the information, Blake asked Valdes, "How much [do] I owe you for this?" and Valdes responded, "Just a thank-you."

Two days later, on March 23, Blake called Valdes again and asked him to run a second license plate query, which Valdes agreed to do. Blake proposed that they meet the next day in person; as Blake testified by way of explanation, a meeting would enable him to offer Valdes money: "I couldn't push [money] through the phone." The FBI equipped Blake

for the meeting with a gold Rolex and Mercedes-Benz automobile with audio and video recorders; it is unclear what the handlers' purpose was in outfitting the phony judge with a Rolex and Mercedes. Blake and Valdes arranged to meet at a local gas station, where Blake paid Valdes $200 and asked him to run a third license plate. Valdes provided Blake with the names and addresses for the second and third plates that evening over the phone, again having obtained the information via WALES.

On March 30, Blake asked Valdes to run a fourth license plate. The two agreed to meet the next day at the same gas station; there, Blake paid Valdes $100 upon receiving the fourth name and address, again obtained via WALES. Blake also asked Valdes to check whether a friend of Blake's "ha[d] a warrant," handing Valdes an additional $100 to "give you a little more incentive." Valdes again used WALES and that night told Blake that there was no warrant out on the person.

Valdes was indicted on three counts of bribery, in violation of 18 U.S.C. § 201(b)(2)(A) and (C). A jury convicted him of three counts of the lesser-included offense of receipt of an illegal gratuity, in violation of 18 U.S.C. § 201(c)(1)(B).

* * *

We review the sufficiency of the evidence de novo, considering it in the light most favorable to the government, to determine whether any rational trier of fact could have found Valdes guilty beyond a reasonable doubt of all required elements of the crime. See *United States v. Schaffer*, 183 F.3d 833, 839-40 (D.C. Cir. 1999).

The anti-gratuity statute provides that:

> Whoever . . . being a public official . . . otherwise than as provided by law for the proper discharge of official duty, directly or indirectly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally for or because of any *official act* performed or to be performed by such official . . . shall be fined under this title or imprisoned for not more than two years, or both.

18 U.S.C. § 201(c)(1)(B) (emphasis added). An "official act" is defined for these purposes as

> any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official . . . .

18 U.S.C. § 201(a)(3). Unlike most of § 201's anti-bribery provisions, the anti-gratuity provision has no requirement that the payment actually "influence[] . . . the performance" of an official act. Compare, e.g., 18 U.S.C. § 201(b)(2)(A) .

Valdes argues that logging onto the WALES system to retrieve public information does not constitute a "decision or action" and that there was no "question, matter, cause, suit, proceeding or controversy" regarding any of the individuals that was or could be pending before Valdes. He relies primarily on *United States v. Muntain*, 610 F.2d 964 (D.C. Cir. 1979), where we found that the defendant Muntain, an Assistant to the Secretary for Labor Relations at the Department of Housing and Urban Development ("HUD"), had not accepted illegal gratuities for an official act when he was compensated by private persons for selling private auto insurance schemes to labor unions with whose leaders he also dealt on official HUD business. We rejected the government's argument that official acts "encompass any acts

within the range of an official's public duties," which the government argued included Muntain's meetings with labor union officials. *Id*. at 967. As the promotion of group auto insurance was not a matter that "could be brought before Muntain—or, for that matter, anyone else at HUD—in an official capacity," there was no danger that the gratuities received could have induced Muntain "to act improperly in deciding a HUD-related matter." *Id*. at 968.

The government tries to distinguish *Muntain* on the basis that it involved *private* auto insurance schemes, whereas (it argues) WALES queries inherently relate to the *official* duty of conducting police investigations. But the *Muntain* court plainly didn't share the government's present view of the public/private divide. Muntain used government resources in contacting possible labor union insurance purchasers, combining trips on government business with insurance promotion. *Id*. at 967-68. Further, besides conducting such meetings, Muntain had, as the government stressed in an alternative argument, wielded his supervisory authority to direct HUD subordinates to assist him in promoting insurance. *Id*. at 969. Thus Muntain deployed government resources (travel opportunities and workforce), just as did Valdes (the WALES database). But in *Muntain* we clearly rejected the idea that such a use of government resources was in itself an "official act" within the meaning of § 201(a)(3).

The government's concept of "official act" is striking in its complete failure to address the statutory clause modifying "decision or action," namely, "on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official." The words are far from self-defining, but they suggest at least a rudimentary degree of formality, such as would be associated with a decision or action directly related to an adjudication, a license issuance (or withdrawal or

modification), an investigation, a procurement, or a policy adoption. Easily included, of course, would be a clerk's manufacture of official government approval of Supplemental Security Income benefits, as in *United States v. Parker*, 133 F.3d 322 (5th Cir. 1998); compare Dissent at 6 n.3, or an official's "ignoring garbage violations and parking violations" he was charged with enforcing, compare Dissent at 10-11. It is telling that the government's brief, in purporting to quote the statute, actually omits all the objects of the preposition "on" except "matter" (using ellipses, to be sure). Appellee's Br. at 35.

Yet in *United States v. Sun-Diamond Growers*, 526 U.S. 398, 406 (1999), the Supreme Court relied on those words in rejecting the government's claim that an official violated the statute in receiving benefits given simply because of his official position. The official's mere "ability to favor the donor in executing the functions of his office" was not enough. *Id*. In reaching its holding the Court discussed several hypothetical gifts that it said would *not* fall under § 201(c)(1)(A) for want of any "official act," including a replica sports jersey given to the President during a ceremonial White House visit, a school baseball cap given to the Secretary of Education during a visit to a school, and a complimentary lunch provided for the Secretary of Agriculture in connection with a speech to farmers. *Id*. at 406-07. While hosting a ceremony, visiting a school, and delivering a speech "are assuredly 'official acts' in some sense," they "are not 'official acts' within the meaning of the statute, which, as we have noted, defines 'official act' to mean 'any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official.'" *Id*. at 407. Thus the Court, in rejecting the above "absurdities," *id*. at 408, invoked the exact words jettisoned by the government here.

Valdes's WALES queries would appear to fit within the range of activities excluded from coverage by *Sun-Diamond*'s examples. All the officials' acts (the WALES queries, ceremony, visit, or speech) have in common that none is a "decision or action" that directly affects any formal government decision made in fulfillment of government's public responsibilities. Thus distortions of government execution of policy are (depending on one's scheme of classification) either non-existent or entirely in the realm of casual and informal use of government resources. While one or more of Valdes's disclosures may have been unethical, sanctionable, or even criminal independently of § 201, and while disclosure of an outstanding arrest warrant might have an indirect effect on its execution, none of these disclosures constituted a "decision or action on any question, matter [etc.]" in the usual sense of those words. *Sun-Diamond* mainly distinguished a "decision or action on any question [etc.]" from mere office-holding and its potential for later action; yet the case also suggests a distinction between a "decision or action on any question [etc.]" and the vast array of behavior that Congress could have covered with some all-encompassing phrase such as "act or conduct related to the official's work or in any way using government resources."

We also put aside for obvious reasons the government's straw man argument that the mere fact that persons were fictitious does not mean that "matters," etc. could not be pending with respect to them. It points to *United States v. Myers*, 692 F.2d 823, 849-50 (2d Cir. 1982), where the Second Circuit upheld conviction of a congressman for receiving bribes to introduce private immigration bills permitting fictitious sheiks to remain in the United States. But, assuming correctness of the decision, private immigration bills are "questions," "matters," and "proceedings" that a congressman could have "brought before" himself and fellow congressmen. *Id*. at 850. Here, by contrast, the informant

plainly sought no change in the status of the FBI's five fictional beings, with respect to whom not even a fictional "question, matter, cause, suit proceeding or controversy" was pending. Of course once there is a fictional person, a fictional "matter" might be ginned up. But a matter can likely be generated for every datum in every government data base. If, as the government implicitly contends, liability applies when no "matter," etc. is either pending, or would be brought into existence "for or because" of the gratuity (as it would have been in *Myers*), or can otherwise in any plausible way "be brought" before the official, the analysis would sweep in any compensation for sharing any such datum.

The government makes two other arguments in support of its expansive reading of "official acts." First, it argues that § 201(c)(1) itself contains a "safety valve," as its language introducing subsections (A) and (B) contains the phrase "otherwise than as provided by law for the proper discharge of official duty." See also § 201(c)(1)(B) (containing the same qualifying clause). At oral argument it suggested specifically that *Sun-Diamond*'s hypothetical of the Secretary of Education's visit and receipt of a baseball cap would be "otherwise" authorized under regulations issued by the Office of Government Ethics ("OGE"), 5 CFR § 2635.204(a), as a gift below $20 and thereby excepted from § 201. See Oral Arg. Tape at 21:20. The OGE regulations, the government argues, further provide that a gift in accordance with the OGE regulations does not violate the anti-gratuity statute. 5 CFR § 2635.202(b). But the *Sun-Diamond* Court has already been there and done that. As Justice Scalia noted, "We are unaware of any law empowering OGE to decriminalize acts prohibited by Title 18 of the United States Code." 526 U.S. at 411. Indeed, the Court indicated just the opposite, namely, that while gifts below $20 are excepted under the OGE regulations, they are *not* excepted under § 201, *id*. at 411-12, and thus rejected the government's claim that the "safe

harbors [from OGE regulations] are, in general, incorporated into the enforcement of section 201." See Reply Brief of the United States at 10, *Sun-Diamond*, 1999 WL 83925. Interestingly, the OGE regulations take away what they purport to give, saying that despite their terms an employee must not "[a]ccept a gift in return for being influenced in the performance of an official act." 5 CFR § 2635.202(c)(1). Application of that provision would in many cases (depending on the relation between the regulation's "influenced" and § 201's "for or because of") return us to the interpretive issue we started with and thus to the government's sweeping notion of an "official act."

More generally, *Sun-Diamond* went on to reason that anti-corruption law manifested a maze of precisely targeted prohibitions, and exceptions from more general prohibitions, so that "a statute in this field that can linguistically be interpreted to be either a meat axe or a scalpel should reasonably be taken to be the latter." 526 U.S. at 412.

Finally, the government argues that *United States v. Birdsall*, 233 U.S. 223 (1914), controls. There the Court said, "Every action that is within the range of official duty comes within the purview of these sections." *Id*. at 230. Whatever the language may mean, the government's proposed broad reading was certainly not *Birdsall*'s holding. The Court was focused on rejecting the defendants' theory on appeal—that for conduct to qualify as an "official act" it must be one "prescribed by statute," *id*. at 231, as one of the decisions under review had held. See *United States v. Birdsall*, 206 F. 818, 821 (D. Iowa 1913); see also *United States v. Van Wert*, 195 F. 974, 977 (D. Iowa 1912) (arguably imposing an even more stringent test, saying that "unless the act . . . is a violation of some act of Congress . . . or of some departmental rule or regulation authorized by Congress . . . no crime has been committed."). So far as authority was concerned, the

Court held, it was enough that the act—there an Interior Department or Bureau of Indian Affairs recommendation of clemency for persons charged with selling liquor to Indians—fulfilled "an established usage which constituted the common law of the department and fixed the duties of those engaged in its activities." 233 U.S. at 231.

We find unconvincing the government's argument that Congress endorsed its reading of *Birdsall* in the 1962 recodification of the statute. See S. Rep. No. 87-2213 (1962), *reprinted in* 1962 U.S.C.C.A.N. 3852. The Report merely notes in cursory fashion that the "term 'official act' is defined to include any decision or action taken by a public official in his capacity as such," *id*. at 3856, and makes no mention of the words that the *Sun-Diamond* Court and we find crucial—the reference to a "question, matter, cause, suit, proceeding or controversy." *Sun-Diamond* and *Muntain*—both decided after the 1962 recodification—clearly reject the notion that "every action within the range of official duty" automatically satisfies § 201's definition. See 526 U.S. at 412; 610 F.2d at 967 n.3

Because the government failed to show that the payments received by Valdes were for any "decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official," as required by 18 U.S.C. § 201, the judgment of conviction is

*Reversed.*

KAREN LeCRAFT HENDERSON, *Circuit Judge*, dissenting:

In Mexico, they call it "la mordida" (literally, "the bite"); in Iran, "bakhshish"; and in France, "pot-de-vin." Here in America, we call it a "payoff" and, today, the majority calls it lawful.

Appellant Nelson Valdes appeals his conviction on three counts of receiving illegal gratuities in violation of 18 U.S.C. § 201(c)(1)(B). The majority concludes that the government's evidence was insufficient as a matter of law to establish that Valdes committed an "official act" within the meaning of 18 U.S.C. § 201(a)(3). In reversing Valdes's conviction, I believe it grossly misconstrues the meaning of the term "official act," relies on inapposite case law and ignores on-point precedent. Accordingly, I must dissent.

I.

On February 17, 2001, Valdes, a Metropolitan Police Department (MPD) officer, first met William Blake, a Federal Bureau of Investigation (FBI) informant posing as a judge, at a popular D.C. nightclub and the two exchanged pleasantries.[1] One week later, Blake again saw Valdes at the nightclub. At that time, Valdes handed Blake a business card and told Blake to call him if Blake ever needed a favor. On St. Patrick's Day, Blake returned to the nightclub and once again saw Valdes. After engaging in small talk, Blake told Valdes that he (Blake) was having difficulty collecting a debt. Blake told Valdes that he might "need him to do me a favor" and handed Valdes $50. Joint Appendix (J.A.) 50. Four days later, Blake called Valdes and asked Valdes to obtain registration information for a certain (fictitious) license plate number. Valdes agreed. Blake called Valdes again later that day to obtain the requested information. Valdes, not having had an opportunity to obtain it, asked Blake to call back later. Blake, in turn, called a third time that day and Valdes supplied him with the registration information. Blake

---

[1]The relationship between Valdes and Blake lasted a little over six weeks during February–March 2001.

asked Valdes, "Uhhhhh, how much [sic] I owe you for this?," and Valdes responded, "Just a thank you." Joint Exhibits Appendix (J.E.A.) 111. Blake told Valdes, "Naw, man, I'll take care of you somehow" and Valdes laughed. J.E.A. 111.

Two days later, Blake called Valdes again. Blake asked Valdes to obtain the registration information for another fictitious license plate number and again Valdes agreed. Blake also suggested a face-to-face meeting on the next day. The next day, Blake called Valdes to arrange the meeting. The two met 15 minutes later at a gas station. During this meeting Blake handed Valdes $200, saying, "Here man, put this in your pocket." J.E.A. at 118. Valdes said, "Oh, thank you." J.E.A. at 119. Blake handed Valdes a scrap of paper with another license plate number on it and asked Valdes to obtain the registration information.

Blake called Valdes again on March 30th, telling Valdes, "I got another tag here for you . . . ." J.E.A. at 129. Valdes told Blake to call back in 20 minutes. Blake called back and gave Valdes another fake license plate number, asking Valdes to meet him in person the next night, and Valdes replied "no problem." J.E.A. at 130. Blake called Valdes the next day to set up the meeting. They agreed to meet in 15 minutes. During the meeting, Valdes handed Blake a piece of paper with the requested registration information written on it. Blake handed Valdes $100 and Valdes responded, "That's cool." J.E.A. 121. Blake then asked Valdes to check for any arrest warrant on a friend of his (also fictitious). He told Valdes, "Okay, yeah, look, give you a little more incentive, right?" and handed Valdes another $100. J.E.A. 122. Valdes replied, "Thanks." J.E.A. 122. Blake called Valdes later that night. Valdes told Blake to call back and Blake called back as Valdes was searching for the arrest warrant information. Valdes informed Blake that there was no outstanding warrant on Blake's friend. J.E.A. 127.

3

Valdes obtained both the registration information and the warrant information from the Washington Area Law Enforcement System (WALES) computer database. In each instance, he logged onto WALES from the police station using his unique user identification number. WALES was accessible to Valdes as an MPD officer only. J.A. 407, 418; J.E.A. 91. Valdes had attended an eight-hour training course, passed an examination and attended re-training biennially in order to maintain his access to WALES. J.A. 416. The use of the database was strictly limited to law enforcement purposes. J.A. 418; J.E.A. 91. Once he logged onto the database, Valdes accessed the information Blake requested.[2] Valdes then relayed to Blake the information he obtained from WALES. Although Valdes did not request payment, he accepted from Blake a total of $400 for the information (and an additional $50 apparently for unspecified future favors). Based on this evidence, the jury convicted Valdes of three counts of receiving an illegal gratuity.

## II.

Section 201(c)(1)(B) of Title 18 of the United States Code makes it unlawful for a public official, directly or indirectly, to "demand[], seek[], receive[], accept[], or agree[] to receive or accept anything of value personally for or because of any official act performed or to be performed by such official." 18 U.S.C. § 201(c)(1)(B). Receiving an illegal gratuity is a lesser-included offense of bribery. *United States v. Brewster*, 506 F.2d 62, 68 (D.C. Cir. 1974); *see also United States v. Schaffer*, 183 F.3d 833, 841 (D.C. Cir. 1999) (noting difference between bribery and illegal gratuity offenses). To establish the offense, the government must prove that the defendant (1) is a public official who (2) accepts, receives, etc. anything of value (3) for or because of any official act performed or to be performed. *See*

---

[2]As the majority notes, the FBI had earlier entered all of the fictitious information into state computer databases accessible through WALES. Maj. op. at 3.

*United States v. Ahn*, 231 F.3d 26, 31 (D.C. Cir. 2000). An "illegal gratuity 'can take one of three forms': (1) a reward for past action, (2) an enticement to maintain a position already taken, or (3) an inducement to take or refrain from some future official action." *See id.* (quoting and citing *Schaffer*, 183 F.3d at 841–42).

The majority concludes that the district court erred in interpreting the statute and that "the government failed to show that the acts for which Valdes received compensation were official acts." Maj. op. at 2. Under 18 U.S.C. § 201(a)(3), an "official act" is defined as

> any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit.

The definition of "official act" has not been substantively altered since it was first codified in 1866. *See* Act of July 13, 1866, ch. 184, § 62, 14 Stat. 168. In 1962, the Congress consolidated in section 201 of Title 18 the various provisions in the criminal code related to bribery. The consolidation effected "no significant changes of substance" and, more important, "[did] not restrict the broad scope of the present bribery statutes as construed by the courts." 1962 U.S.C.C.A.N. 3852, 3853. Of particular relevance, the Senate Report noted that "[t]he term 'official act' is defined to include any decision or action taken by a public official in his capacity as such." *Id.* at 3856.

As the majority states, maj. op. at 7–8, the United States Supreme Court first interpreted the "official act" language in *United States v. Birdsall*, 233 U.S. 223 (1914). In that case, the Court reinstated bribery charges against Birdsall in connection with money he paid Interior Department officials to induce them to recommend leniency for certain persons convicted of selling

liquor to Indians. *Id.* at 231. The statute at issue in *Birdsall*—close in wording to the one we interpret today—made it illegal for an official to accept money given with the intent to influence "his decision or action" "on any question, matter, cause, or proceeding which may at any time be pending, or which may by law be brought before him in his official capacity." Crim. Code § 39, 117, 35 Stat. 1096, 1109 (1909). Birdsall argued that the indictment charged no offense because the officials' recommendations of clemency did not constitute official acts under the statute. *Birdsall*, 233 U.S. at 227. The district court agreed, finding conclusive the fact that no statute gave Interior Department officials the power to make sentencing recommendations. *United States v. Birdsall*, 206 F. 818, 821 (D.C. Iowa 1913). The Supreme Court, however, disagreed with the district court's conclusion that an act was "official" only if a statute explicitly authorized the official to perform it. *Birdsall*, 233 U.S. at 231. The Court declared that "[e]very action that is within the range of official duty comes within the purview" of the bribery statute. *Id.* at 230. It did not matter that the power to make such recommendations was not expressly granted by statute, rule or regulation. *Id.* at 231–32. The Court held that an "official act" may be found in "established usage," noting that "in numerous instances, duties not completely defined by written rules are clearly established by settled practice, and action taken in the course of their performance must be regarded as within the provisions of the above-mentioned statutes against bribery." *Id.* at 231.

Our court has also taken a broad view of the meaning of "official act" as used in the bribery statute. In *United States v. Muntain*, 610 F.2d 964 (D.C. Cir. 1979), we discussed *Birdsall*, noting approvingly that other courts had interpreted "official act" to include those "actions or decisions involving matters falling indisputably within the ambit of the public official's official duties." *Id.* at 968 n.3. On the other hand, we concluded that the term "official act" did not include the use of one's status

as a public official to promote a purely private venture. *Id.* at 968. Muntain, a Housing and Urban Development (HUD) undersecretary, peddled private group automobile insurance to labor unions with which he dealt in his official capacity. *Id.* at 966–67. The use of his official status to further his private venture did not run afoul of section 201 because "there was no evidence that Muntain's meetings with labor officials to discuss and promote group automobile insurance involved a subject which could be brought before Muntain or, for that matter, anyone else at HUD in an official capacity." *Id.* at 968. We noted, however, that the decision would have been different had the government shown that "[Muntain's] responsibilities . . . at HUD ha[d] been expanded by settled practice or otherwise to include meeting with labor union officials concerning group automobile insurance."[3] *Id.* at 968 n.3.

---

[3]*See also United States v. Parker*, 133 F.3d 322, 325 (5th Cir. 1998), *cert. denied*, 523 U.S. 1142. In that case, the defendant was charged with violating section 201(b)(2)(C), which prohibits a public official from "being induced to do or omit to do any act in violation of [his] official duty." Parker, a clerk to an administrative law judge (ALJ) in the Social Security Administration (SSA), logged onto a database and made false entries. She argued that that her conduct did not constitute an act in violation of her official duty because she was not authorized to make the entries. *Id.* The court rejected her argument, using section 201(a)(3)'s "official act" definition. It found that her conduct constituted an "official act" because the appeals in which she entered fraudulent entries were pending in her "place of trust or profit" and her "abuse of the SSA facilities and equipment" coupled with abuse of her legitimate authority allowed her to make the entries. *Id.* at 326. While the majority "easily" includes Parker's acts within its definition of "official act," *see* maj. op. at 7, I doubt that it agrees with *Parker*'s precise holding: "We therefore hold that the term 'official act' encompasses *use of governmental computer systems* to fraudulently create documents . . . , even when the employee's scope of authority *does not formally* encompass the act." *Id.* (emphases added).

The Supreme Court discussed the meaning of "official act" in *United States v. Sun-Diamond Growers of California*, 526 U.S. 398 (1999). Its *holding*, however, covers a different issue, namely, "whether conviction under the illegal gratuity statute requires any showing beyond the fact that a gratuity was given because of the recipient's official position." *Id.* at 400. Consequently, the Court's treatment of "official act" is dictum. It does not, and was not intended to, sub silentio, lessen the vitality of *Birdsall* and its progeny.[4] But even if the Court's "official act" discussion were not dictum, Valdes's conviction of receiving illegal gratuities would nonetheless easily stand. While the linguistics of section 201(a)(3) may be complicated, the reason that Valdes's receipt of money for accessing information falls within its definition is simple.

In *Sun-Diamond*, the Court chose what it termed "the more natural meaning" of section 201(a)(3), that is, that a gratuity received "for or because of any official act" means "for or because of some *particular* act of whatever identity." *Id.* at 406 (emphasis added). It then discussed the "peculiar results" the alternative reading would produce, criminalizing the receipt of such token gifts as a sports jersey, a school baseball cap and a free lunch—all received by the public official "based on his official position and not linked to any identifiable act." *Id.* Anticipating the response that interpreting "official act" to require an identifiable act would also produce "peculiar results" in the sports jersey/school baseball cap/free lunch scenarios— i.e., a sports jersey "*for*" a White House visit, a baseball cap "*for*" a visit to the school and a free lunch "*for*" a speech—the

---

[4]*See Muntain*, 610 F.2d at 968 (citing *Birdsall*); *see also Parker*, 133 F.3d at 326 (same); *United States v. Biaggi*, 853 F.2d 89, 98–99 (2d Cir. 1988), *cert. denied*, 489 U.S. 1052 (1989) (Congressman's letters on office letterhead to New York mayor regarding a corporation's arrears to city constitutes "official act," citing *Birdsall*).

Court dismissed these "absurdities" as falling outside the statutory definition of "official act." *Id.* at 408. By linking the violation to a particular "official act," it concluded, "it is possible to eliminate the absurdities *through the definition of that term*." *Id.* (emphasis original). Hosting a sports team, visiting a school and public speaking are not, in the words of section 201(a)(3), "decision[s] or action[s] on any question, matter, cause, suit, proceeding or controversy, . . . at any time . . . pending, or . . . by law . . . brought before [the President or a Cabinet Secretary]."

Not so with Valdes's accessing and disclosing police information.[5] Valdes "act[ed] on a question, . . . which may at any time be pending, or . . . by law be brought before [him], in [his] official capacity." The "question[s]" were "who owns this license plate?" and "is there an outstanding arrest warrant charging this person?" Valdes's "action" was to investigate by accessing WALES.[6] And "for" this action, which he undertook multiple times, he "accept[ed] . . . value personally [$400]" in violation of 18 U.S.C. § 201(c)(1)(B). How many times in performing his official duties has Valdes investigated vehicle registration and outstanding warrants by accessing WALES? While on patrol, probably hourly—while at headquarters, as requests for that information are made of him. The point is, as I noted earlier, simple. Valdes accepted money for performing his duty as an MPD officer. And section 201(c)(1)(B) makes this conduct illegal.

---

[5]The majority also characterizes the information Blake requested as "police" information. Maj. op. at 3.

[6]Alternatively, Valdes could be viewed as having "act[ed]" on the "matter" of vehicle registration and arrest warrant information. Such information is continuously "pending" before Valdes as part of his job entails accessing it. Finally, the "matter" before Valdes was in his "place of trust or profit" as WALES was accessible to him solely because of his official position.

The majority puts all its eggs in the *Sun-Diamond* basket and, in so doing, scrambles them. First, it treats the Court's "official act" discussion as something more than dictum.[7] Second, it equates Valdes's WALES search with White House and school visits and a speech, concluding that none constitutes a " 'decision or action' that directly affects any formal government decision made in fulfillment of government's public responsibilities."[8] Maj. op. at 8. Building on this language (which is nowhere even hinted at in *Sun-Diamond*), it then makes an exception from section 201(c)(1)(B)'s prohibition for "casual and informal use of government resources." *Id.* Nonsense! *Sun-Diamond* recognizes no de minimis, "casual," "informal" or any other type of weighted exception from section 201's coverage. Instead, the Court uses the definition of "official act" to opine that certain actions would not be "within the meaning of the statute."[9] *Sun-Diamond*, 526 U.S. at 407.

---

[7]While the majority dismisses the language in *Birdsall* as dictum because, in its view, that language is not necessary to the Court's holding, *see* maj. op. at 11, it considers the *Sun-Diamond* dictum oracular in interpreting "official act."

[8]To equate a police officer's taking money from a private citizen for investigating/revealing police information with the President's accepting a jersey from a championship sports team for honoring the team at the White House is itself an "absurdity."

[9]Before its *Sun-Diamond* discussion, the majority notes that the words of section 201(a)(3), while "far from self-defining," "suggest at least a rudimentary degree of formality such as, . . . an adjudication, a license issuance, . . . [or] *an investigation.*" Maj. op. at 7 (emphasis added). While I plainly do not agree with the formal/informal dichotomy the majority has fashioned, I note that it at least recognizes that "an investigation"—precisely what Valdes does, and did here, as an MPD officer—would carry the necessary weight.

Were the majority correct—that "official act" includes only "formal" duties—then a law enforcement officer's *failure* to perform his official—but routine—duties for money, which was, before today, illegal, *see, e.g., Ahn*, 231 F.3d at 32 (reasonable juror could find police officer's failure to report violations of law "official act"), would likewise be decriminalized for the requisite "rudimentary degree of formality" would be lacking. Our society knows what happens when we allow a police officer to take money for doing—or not doing—his job. It produces a man like Captain McCluskey:

> He had been a good cop, a brave cop. The tough young punks terrorizing the street corners fled when he approached and finally vanished from his beat altogether. He was a very tough cop and a very fair one. He never took his son around to the storekeepers to collect his money presents for ignoring garbage violations and parking violations; he took the money directly into his own hand, direct because he felt he earned it . . . . He always made his rounds. He gave his stores a lot of protection, a lot of service. When winos and drunks filtered up from the Bowery to panhandle on his beat he got rid of them so roughly that they never came back. The tradespeople in his precinct appreciated it. And they showed their appreciation.

> He also obeyed the system. The bookies in his precinct knew he would never make trouble to get an extra payoff for himself, that he was content with his share of the station house bag. His name was on the list with the others and he never tried to make extras. He was a fair cop who took only clean graft and his rise in the

> police department was steady if not spectacular.

Mario Puzo, *The Godfather* 137 (Signet ed. 1978).

I believe that the government has established that Valdes's accessing of police information constitutes an "official act." Notwithstanding some of the information was otherwise publicly available, WALES was available to Valdes *only* by virtue of "[his] official capacity." Moreover, the arrest warrant information was not, as the majority concedes, publicly available. *See* maj. op. at 2.

Today, the majority sets free a law enforcement officer who accepted money personally for taking action in his official capacity—precisely the conduct at which section 201(c)(1)(B) is aimed. It ignores decades-old (and unchallenged) case law and replaces a bright-line rule with an amorphous test that depends on whether the action taken or decision made is "formal."[10] *See* maj. op. at 8–9. Such an interpretation is neither workable, reliable nor justifiable. Accordingly, I respectfully dissent.

---

[10]The majority's discussion of *Birdsall* begins by minimizing *Birdsall*'s broad definition of "official act" ("[e]very action that is within the range of official duty") with the prefatory remark "Whatever the language may mean." Maj. op. at 11. It concludes with the statement that "*Sun-Diamond* and *Muntain* . . . clearly reject the notion that 'every action within the range of official duty' automatically satisfies § 201's definition." *Id*. at 12. First, *Sun-Diamond* does not "clearly" reject *Birdsall*'s language. The Court does not even mention *Birdsall* because the definition of "official act" was not the issue before it. As for *Muntain*, this court did *not* reject *Birdsall*'s formulation—it restated that formulation as follows: "Every action . . . within the range of official duty . . . include[s] as well those duties customarily associated with a particular job." 610 F.2d at 968 n.3. Valdes's accessing of police information fits this formulation as well.