Opinion for the Court filed by Senior Circuit Judge WILLIAMS.
Concurring opinion filed by Circuit Judge KAVANAUGH, with whom Senior Circuit Judge WILLIAMS joins.
Dissenting opinion filed by Circuit Judge HENDERSON, with whom Circuit Judge RANDOLPH joins.
Dissenting opinion filed by Circuit Judge GARLAND, with whom Circuit Judges SENTELLE, HENDERSON, RANDOLPH, and BROWN join.
WILLIAMS, Senior Circuit Judge.
An FBI informant working undercover gave cash to Nelson Valdes, then a detective with the D.C. Metropolitan Police Department (“MPD”). The cash was apparently a reward for Valdes’s searching several police databases to supply otherwise publicly available information to the informant. Based on these exchanges, Valdes was convicted under 18 U.S.C. § 201(c)(1)(B) of three counts of receiving an illegal gratuity “for or because of an[ ] official act.” Valdes argues that the statute is far less sweeping than the government successfully claimed in district court, and that, under a proper construction, the government’s evidence was insufficient to show that either his database queries or the release of the resulting information constituted an “official act” under the statute. He makes a number of *1321 other claims, including attacks on two related aspects of the jury instruction.
A panel of the court agreed that under a correct analysis of the statute the evidence was insufficient, and accordingly reversed the judgment; the panel did not reach Valdes’s other claims. United States v. Valdes, 437 F.3d 1276 (D.C.Cir.2006). The full court resolved to hear the case en banc, on the sufficiency issue and on whether the district judge’s charge had correctly defined an “official act.” We now decide that the government failed to show that the acts for which Valdes received compensation fell within the scope of § 201(c)(1)(B); our analysis of the statute also makes clear that the jury charge was error. We therefore reverse the conviction.
‡ ‡ ‡ ‡ ‡
On the evening of February 17, 2001 William Blake, working as an undercover informant for the FBI, went on assignment to a Washington, D.C. nightclub called “1223” (located at 1223 Connecticut Avenue, NW). At “1223” Blake was introduced to Valdes as a judge, and Valdes in turn identified himself as an MPD detective. The two met again at “1223” a week later, on which occasion Valdes gave Blake his business card with his cell phone number, “just in case [Blake] ever needed a favor.”
On March 17 an FBI agent instructed Blake to see if Valdes would provide him with police information. The FBI then entered the names of five fictitious individuals, along with fictitious addresses and license plate numbers, into state computer databases. That evening, again at “1223,” Blake asked Valdes if he could do him a “favor” and look up some license plate numbers, ostensibly to get contact information on individuals who owed him money. Valdes indicated that this would be “no problem” and told Blake to call him on his cell phone to' get the information. On leaving, Blake handed Valdes a $50 bill; no testimony describes the accompanying conversation, if any. Four days later, Blake called Valdes, introducing himself as “the judge,” reiterated his earlier request, and provided Valdes with the first license plate number. Valdes then obtained the name and address of the license holder through a query to the Washington Area Law Enforcement System (‘WALES”), a computer database linked to state databases. When Blake called back later, Valdes provided him with the name and address. After expressing satisfaction with the information, Blake asked Valdes, “How much [do] I owe you for this?” and Valdes responded, “Just a thank-you.”
Two days later, on March 23, Blake called Valdes again and asked him to run a second license plate query, which Valdes agreed to do. Blake proposed that they meet the next day in person; as Blake testified by way of explanation, a meeting would enable him to offer Valdes money: “I couldn’t push [money] through the phone.” The FBI equipped Blake for the meeting with a gold Rolex and a Mercedes-Benz automobile with audio and video recorders; it is unclear what the handlers’ purpose was in outfitting the phony judge with these luxury items. Blake and Valdes arranged to meet at a local gas station, where Blake handed Valdes $200 and asked him to run a third license plate. Valdes provided Blake with the names and addresses for the second and third plates that evening over the phone, again having obtained the information via WALES.
On March 30, Blake asked Valdes to run a fourth license plate. The two agreed to meet the next day at the same gas station; there, Blake paid Valdes $100 upon receiving the fourth name and address, again obtained via WALES. Blake also asked Valdes to check whether a friend of *1322 Blake’s “ha[d] a warrant,” handing Valdes an additional $100 to “give you a little more incentive.” Valdes again used WALES and that night told Blake that there was no warrant out on the person.
Valdes was indicted on three counts of bribery, in violation of 18 U.S.C. § 201(b)(2)(A) and (C). A jury convicted him of three counts of the lesser-included offense of receipt of an illegal gratuity, in violation of 18 U.S.C. § 201(c)(1)(B).
* * * Hi sK *
We review the sufficiency of the evidence de novo, considering it in the light most favorable to the government, to determine whether any rational trier of fact could have found Valdes guilty beyond a reasonable doubt of all the required elements of the crime. See United States v. Schaffer, 183 F.3d 833, 839-40 (D.C.Cir.1999).
The anti-gratuity statute provides that: Whoever ... being a public official ... otherwise than as provided by law for the proper discharge of official duty, directly or indirectly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally for or because of any official act performed or to be performed by such official ... shall be fined under this title or imprisoned for not more than .two years, or both.
18 U.S.C. § 201(c)(1)(B). An “official act” is defined for these purposes as
[1] any decision or action [2] on any question, matter, cause, suit, proceeding or controversy, [3] which may at any time be pending, or which may by law be brought [4] before any public official, in such official’s official capacity ....
18 U.S.C. § 201(a)(3). Unlike most of § 201’s anti-bribery provisions, the anti-gratuity provision has no requirement that the payment actually “influence[ ] ... the performance” of an official act. Compare, e.g., 18 U.S.C. § 201(b)(2)(A). Conversely, the bribery provisions reach a number of additional “predicate acts,” most notably an official’s “act in violation of ... lawful duty,” 18 U.S.C. § 201(b)(1)(C); see also id. § 201(b)(2)(C) (“in violation of ... official duty”), not covered in the gratuity ban.
The government maintains that the bribery and gratuity statute should be construed broadly, to encompass essentially any action which implicates the duties and powers of a public official. At oral argument, counsel argued that the specific requirements of 18 U.S.C. § 201(a)(3) are “equivalent” to a statute that would simply prohibit “any decision or action within the scope of the official’s authority.” Transcript of Oral Argument at 35. This view, the government argues, is consistent with the Supreme Court’s statement that “[e]very action that is within the range of official duty comes within the purview of these sections.” United States v. Birdsall, 233 U.S. 223, 230, 34 S.Ct. 512, 58 L.Ed. 930 (1914). To the extent that the statutory clause modifying “decision or action,” namely, “on any question, matter, cause, suit, proceeding or controversy,” constitutes limiting language (a point the government does not concede), the government alleges that it is not relevant here: Valdes’s searches and disclosures constitute plain “actions” on clear “questions,” namely, ‘Who owns this license plate and where does he or she live?” and “Does this man have an outstanding arrest warrant?” Appellee’s Br. 29.
The government’s position, however, both misinterprets the Supreme Court and ignores the plain text of the statute. Whatever the broad language in Birdsall may mean, it was certainly not the Court’s holding. In Birdsall, the Court was focused on rejecting the defendants’ theory on appeal — that for conduct to qualify as *1323 an “official act” it must be one “prescribed by statute,” 233 U.S. at 231, 34 S.Ct. 512, as one of the decisions under review had held, see United States v. Birdsall, 206 F. 818, 821 (D.Iowa 1913); see also United States v. Van Wert, 195 F. 974, 977 (D.Iowa 1912) (arguably imposing an even more stringent test, saying that “unless the act ... is a violation of some act of Congress ... or of some departmental rule or regulation authorized by Congress ... no crime has been committed.”). Rejecting this very narrow definition, the Court held simply that “[i]n numerous instances, duties not completely defined by written rules are clearly established by settled practice, and action taken in the course of their performance must be regarded as within the provisions of the above-mentioned statutes against bribery.” Birdsall, 233 U.S. at 231, 34 S.Ct. 512. Birdsall did not, however, stand for the proposition that every action within the range of official duties automatically satisfies § 201’s definition; it merely made clear the coverage of activities performed as a matter of custom.
More useful to this case is the Supreme Court’s observation in United States v. Sun-Diamond Growers, 526 U.S. 398, 119 S.Ct. 1402, 143 L.Ed.2d 576 (1999), that § 201(c) was “merely one strand of an intricate web of regulations, both administrative and criminal, governing the acceptance of gifts and other self-enriching actions by public officials.” Id. at 409, 119 S.Ct. 1402. The Court went on to say that § 201(c)’s context warranted a specific interpretive approach:
[T]he numerous ... regulations and statutes littering this field[ ] demonstrate that this is an area where precisely targeted prohibitions are commonplace, and where more general prohibitions have been qualified by numerous exceptions. Given that reality, a statute in this field that can linguistically be interpreted to be either a meat axe or a scalpel should reasonably be taken to be the latter.
Id. at 412, 119 S.Ct. 1402. In Sun-Diamond, this adjuration led the Court to reject the government’s theory that 18 U.S.C. § 201(a)(3) covers any action taken in an official capacity. While numerous activities — hosting a ceremony, visiting a school, or delivering a speech, for example — “are assuredly ‘official acts’ in some sense,” id. at 407, 119 S.Ct. 1402, it would be “absurd[ ],” the Court said, to consider them within the scope of § 201, id. at 408, 119 S.Ct. 1402. Sum-Diamond’s interpretive gloss, like the rule of lenity, thus works to protect a citizen from punishment under a statute that gives at best dubious notice that it has criminalized his conduct.
Importantly for our purposes, the Sum-Diamond Court reached its conclusion “through the definition of [the] term [‘official act’],” id. (emphasis altered), and, in particular, through a clause that the government seems quick to ignore here, namely “on any question, matter, cause, suit, proceeding or controversy.” At a minimum the government’s interpretation of this six-term series is overly expansive, extending the statute to any action that in effect answers any question. More broadly, the government’s theory reads the series out of the statute entirely. Neither position squares with Sum-Diamond’s direction or gives effect to all of the statutory language.
In contrast, relying on the canon of nos-citur a sociis, we believe that the words “question” and “matter” are known by the company that they keep. See, e.g., Cal. Indep. Sys. Operator Carp. v. FERC, 372 F.3d 395, 399-401 (D.C.Cir.2004) (describing the canon); see also United States v. Menasche, 348 U.S. 528, 538, 75 S.Ct. 513, 99 L.Ed. 615 (1955) (“The cardinal princi- *1324 pie of statutory construction is to save and not to destroy.”) (internal quotation omitted); Gustafson v. Alloyd Co., Inc., 513 U.S. 561, 573-75, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995) (applying Menasche’s principle). Seen in that light, the six-term series refers to a class of questions or matters whose answer or disposition is determined by the government. That class includes such questions as “Should the Congress enact new legislation regulating corporate directors?,” “Should this person be prosecuted?,” and “What firm should supply submarines for the Navy?” But it would not include questions like “What is your name?,” an issue that the government does not normally resolve.
Our reading of the statute is buttressed by the elements immediately preceding and following the six-term series. It would be linguistically odd, at a minimum, to treat an answer to a question as a “decision or action on” a question unless the answer were one that the government had authority to decide. The same holds true of the clause requiring that such questions or matters be of a class which “may at any time be pending, or which may by law be brought before any public official.” Questions not subject to resolution by the government are not ordinarily the kind that people would describe as “pending” or capable of being “by law ... brought” before a public official, especially if the law imposes no mandate on the official (or perhaps any official) to answer.
Our interpretation of the statute squares with this court’s earlier decision in United States v. Muntain, 610 F.2d 964 (D.C.Cir.1979), where we found that the defendant, an Assistant to the Secretary for Labor Relations at the Department of Housing and Urban Development (“HUD”), had not accepted illegal gratuities for an official act when he received compensation from private persons for selling private auto insurance schemes to labor unions with whose leaders he also dealt on official HUD business. In doing so we characterized the government as asking the court to “construe 18 U.S.C. § 201(g) [prior version of § 201(c)(1)(B) ] as a statutory prohibition against the misuse of public office and contacts gained through that office to promote private ends,” id. at 967; we plainly rejected that construction. Nor were we ready to read the statute as barring Mun-tain’s corralling his subordinates into his insurance promotion enterprise, given the absence of any behavior meeting the statutory definition of “official act.” Id. at 969. Affirmatively, we said that “[i]t is the corruption of official decisions through the misuse of influence in governmental decision-making which the bribery statute makes criminal.” Id. at 968.[1] Understandably, the dissenters’ brief discussion of the Muntain decision fails to explain what distinguishes Muntain’s case (the use of government property and his own subordinates to offer private deals to union officials, with whom it was his job to deal on official matters) from Valdes’s (use of government resources to answer Blake’s questions).
Thus, both our precedent and the language of the statute make clear that § 201 is not about officials’ moonlighting, or their misuse of government resources, or the two in combination. Even apart from the anti-bribery statute (which we discuss below in addressing the dissenters), numerous other regulations and statutes prohibit these activities. See, e.g., 18 U.S.C. § 641 (prohibiting the conversion of government property); 5 U.S.C. § 7353 (restricting federal employees’ acceptance of gifts); 18 U.S.C. § 2721 (limiting disclosure — not *1325 only by state employees but by other “authorized reeipient[s]” — of personal information such as a driver’s address contained in state motor vehicle records); cf. D.C.Code § 22-704 (prohibiting gratuities which cause an “official to execute any of the powers in such official vested ... otherwise than is required by law”). And though the likelihood that Valdes violated these other statutes implies nothing direct about his culpability under § 201, then-existence underscores an observation in Sun-Diamond: “Absent a text that clearly requires it, we ought not expand this one piece of the regulatory puzzle so dramatically as to make many other pieces misfits .... [N]ot only does the text here not require that result; its more natural reading forbids it.” 526 U.S. at 412, 119 S.Ct. 1402.
Having defined the statute’s domain negatively, we nonetheless emphasize that today’s decision is in no way at odds with numerous other cases finding liability under § 201. By focusing on those questions, matters, causes, suits, proceedings, and controversies that are decided by the government, our interpretation of the statute easily covers: a clerk’s manufacture of official government approval of a Supplemental Security Income benefit, as in United States v. Parker; 133 F.3d 322 (5th Cir.1998); a congressman’s use of his office to secure Navy contracts for a ship repair firm, as in United States v. Biaggi, 853 F.2d 89 (2d Cir.1988); and a Veterans’ Bureau official’s activity securing a favorable outcome on a disability claim, as in Beach v. United States, 19 F.2d 739 (8th Cir.1927) (based on a predecessor .statute). All of those cases are clearly covered by the statute because they concern inappropriate influence on decisions that the government actually makes. Questions like “Should this person receive a contract or disability benefit, and for how much?” are simply in a different class from questions like ‘Where do you live?” and “What kind of car do you drive?” Section 201(a)(3) clearly encompasses the former, but not the latter.
Our understanding of the term “official act” is thus in stark contrast to the definition given in the post-trial jury instructions:
The term “official act” means any decision or action within the scope of the public official’s authority. The term “official act” includes the decisions or actions generally expected of a public official such as a police officer. These decisions or actions do not need to be specifically described by law, rule, or job description to be considered an official act. Similarly, the term official duty is not limited to a duty imposed by law or statute, but includes any duty lawfully imposed in any manner by settled practice within the government agency.
Over the explicit objection- of the defendant, the court refused to' include either the statutory language on which we have focused — the definition of “official act” — or anything comparable. In light of our interpretation of the statute, this was error — and by no means harmless error. Cf. United Mine Workers v. Pennington, 381 U.S. 657, 670, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965) (“Such conduct is not illegal .... The jury should have been so instructed and ... we cannot hold this lapse to be mere harmless error.”).
í]* íji H[4]
Our dissenting colleagues suggest that Valdes’s queries violate § 201(c)(1)(B) because they constitute a police investigation. We share an important premise of this argument, namely the proposition that a police investigation is in the same class of processes as a “question, matter, cause, suit, proceeding or contro *1326 versy.” “Should the police investigate this person?,” for example, is clearly a question answered by the government. Providing or receiving gifts for or because of decisions to initiate, accelerate, retard, conclude, or skew such an investigation is unquestionably conduct prohibited by § 201.
Simply stating that police investigations are covered by the bribery and gratuity statute does little to resolve the case, however. While there does not appear to be any direct precedent on the point, it seems implausible to assert that any interrogative action done by an officer using government resources constitutes an action on an “investigation” of the kind which would be covered by § 201(c). The dissenters are able to reach the contrary conclusion only because of their readiness both to disaggregate the activities that may be undertaken as part of an “investigation,” and to generalize them. Of course “many police investigations are quite brief.” Judge Garland’s Dissent at 1337. And asking questions (of people, databases, and real evidence) is certainly a part of investigating. Id. at 1323-24. But it would constitute an enormous expansion of the gratuities provision to define “action” on a “matter” as encompassing every question asked and answered, or even every question that somehow parallels those an official might ask as part of his official duty and whose answer might entail a use of government resources. It would bring under the clause a broad range of moonlighting activities that in any way paralleled an official’s regular work (and perhaps that of a broad spectrum of fellow workers, as well). Thus, a Department of Justice lawyer who used a government Westlaw account to look up a legal question for a friend would be, in the dissenters’ view, “deciding]” a “question” that might “be brought before [him].” This goes too far — and the dissenters do not define the outer bounds of their theory. See id. at 1328.
At the very least, we believe that a police officer’s ascertainment of answers to questions cannot amount to a “decision or action” on an investigation unless the ascertainment itself, or other activity in the real world, could have some prospect of bringing about (or, for that matter, squelching or redirecting) some sort of government investigation. Certainly Valdes’s behavior is a far cry from that found illegal in United States v. Carson, 464 F.2d 424 (2d Cir.1972), where the investigation at issue was already underway, see id. at 426, or in United States v. Ahn, 231 F.3d 26 (D.C.Cir.2000), where the police officer defendant visited illegally operated massage parlors and, in lieu of reporting the violations as duty required, secured payments from the parlors’ operators, see id. at 32. Valdes’s queries belonged to no such active or incipient police investigation.
The dissenters mistakenly assert or at least imply that our decision will have two adverse consequences: first, that it will narrow the range of available “sting” operations against corrupt public officials, see Judge Garland’s Dissent at 1337-38, and second, that many “successful bribery prosecutions under [§ 201(b)(2)(A) ]— which depend upon the same definition of ‘official act’ as - gratuity prosecutions— would not be possible” after our decision, id. at 1324. Both concerns are quite ill-founded.
Our decision has no effect on law enforcement’s ability to conduct “sting” operations. The government’s problem is not that Valdes’s queries involved purely fictional people. Even if Blake had sought license plate and warrant information about real people, that fact would not have transformed his five questions, or Valdes’s answers, or both, into a government inves *1327 tigation, or any other kind of “matter,” etc., covered by § 201(a)(3); those actions had no relationship whatsoever even to a fictional government investigation. Conversely, inveigling a suspect into a “sting” investigation can generate criminal behavior under our reading of the statute. Had government agents created an apparent drug investigation scenario, and had Blake asked Valdes to add or subtract specific individuals to be questioned, and paid him “for or because of’ Valdes’s compliance, the “sting” character of the events would not absolve Valdes.
It is equally alarmist to suggest that our decision will somehow render bribery prosecutions difficult to pursue. It is true that the bribery and gratuity provisions overlap in the sense that one type of predicate act covered by both provisions is an “official act” as defined in § 201(a)(3). See §§ 201(b)(1)(A) & 201(b)(2)(A) (stating “official act” predicate for bribery, for offeror and recipient of bribe, respectively). But the bribery provisions cover two additional predicate classes, one of which consists of acts “in violation of the lawful duty of such official or person.” See § 201(b)(1)(C); see also § 201(b)(2)(C) (“in violation of the official duty of such official or person”). Though the dissenters attempt to cast doubt on this variation of the bribery prohibition by noting that our court has not yet had occasion to construe “official duty,” the many successful prosecutions under that term make reasonably clear that it embraces the dissenters’ numerous hypotheticals. See, e.g., Parks v. United States, 355 F.2d 167 (5th Cir.1965) (explicitly finding that defendant’s arrangement to pay an Air Force sergeant to sell names of new recruits constituted inducement to do an act in violation of the sergeant’s lawful duty); see also United States v. Cruz, 946 F.2d 122, 123 (11th Cir.1991) (defendant convicted under bribery statute for providing an investigative target with “information relating to the IRS and FBI’s investigations in exchange for money”); United States v. Lanci, 669 F.2d 391 (6th Cir.1982) (defendant convicted of bribery and conspiracy for his role in arranging to bribe an FBI employee to divulge confidential information, such as the names of FBI informants). Cf. United States v. Gjieli, 717 F.2d 968, 974 (6th Cir.1983) (holding (in the bribery context) that the “official duty” provision is broader than the “official act” provision in that only the latter requires that “the act induced fall within the federal employee’s official function”). Our decision therefore plainly continues to allow bribery prosecutions when, for example, someone offers something of value to induce an official to provide information in violation of official duty.
We believe that § 201 thus reflects a kind of balance between the bribery and gratuity violations. For the former, it defines the predicate acts broadly, but the required compensatory link narrowly; culpability attaches for “any official act,” “any fraud,” or “any act in violation of [a] lawful duty,” but the payment at issue must actually influence the act or omission. See §§ 201 (b)(l)-(2). For gratuities, the reverse is true; the predicate acts are defined narrowly (excluding, for instance, mere violation of an official duty), and the required compensatory link is defined more broadly (“for or because of,” even where the compensation has had no influence). See § 201(c)(1).
The dissenters suggest that the legislative history undermines this analysis because of a House Report, H.R.Rep. No. 87-748, at 19 (1961), observing that the gratuity provision strikes at conduct -with “the appearance of evil.” Judge Garland’s Dissent at 1345. But a generality of this sort seems a weak basis for disregarding the differences in statutory language. *1328 When Congress in 1962 reorganized the bribery statute and added an illegal gratuity offense, it could easily have made that provision perfectly mirror all of the predicate acts listed in the older bribery provision; instead, however, it chose to include only the “official act” predicate of 18 U.S.C. § 201(b)(1) & § 201(c)(1) (1964), and not the “fraud” or “official duty” predicates of 18 U.S.C. § 201(b)(2)-(3) & § 201(c)(2)-(3) (1964). See 18 U.S.C. § 201(f) & § 201(g) (1964). The textual distinction could not be clearer.
The dissenters then go on to reason that we do “public officials no favor” by effectively eliminating “illegal gratuity” as a lesser included offense of bribery, as it deprives juries of the chance to give defendants a break. Judge Garland’s Dissent at 1345. This of course disregards all the cases where the behavior meets the predicate act requirements of both statutes. More importantly, our job is not to provide juries with a broad menu of opportunities to punish an “evil act.” We are to interpret the text of the statute as written by Congress. Here, the bribery provision covers a larger set of predicate acts than does the gratuity provision. Judicial extension of those for the gratuity provision would disturb the balance Congress chose — which, of course, it is free to modify at any time. Cf. United States v. Leyva, 282 F.3d 623, 625 (9th Cir.2002) (noting with regard to § 201(b)(2)(B), which prohibits acts of fraud on the United States, that “[t]he absence of any official act requirement is particularly pointed in light of explicit ‘official act’ or ‘official duty’ language in other subsections of § 201,” and that “[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.”) (internal citations omitted) (internal quotation omitted).
:j: # # :¡í % ‡
Though not squarely raised, a set of arguments closely related to that made by the dissenters requires examination: That even if Valdes’s actions do not themselves constitute an “investigation,” his queries and disclosures constitute elements of— i.e., “decision[s] or action[s] on” — some future investigation that might one day “be brought” before Valdes or another public official.
In line with our previous discussion, simple interrogative activity cannot qualify as a “decision or action on any question, matter, cause, suit, proceeding or controversy” merely because one can imagine that the activity would qualify as such in some imagined investigation that might conceivably “be brought” before some public official. Any such notion appears to lack a limiting principle; in our context, for example, it would encompass any WALES search, even if the officer revealed the results to no one, because that search might one day be relevant to a future investigation. The more natural reading of the “may by law be brought” language would recognize, however, that “question[s], matter[s]” and the like typically can not “by law be brought” before an official until the underlying issue has surfaced to some degree. An obvious case would be a gratuity for an NLRB member offered “for or because of’ his hoped-for ruling on a matter then (1) pending before an ALJ or (2) extant in the form of a company’s or union’s initial charge. Perhaps a live labor dispute with real potential for Board intervention might be enough (we need not decide the point). In all these cases the “matter” that “may by law be brought” before the Board is at least nascent; it is not a pure fiction. The same is true for the clause “may at any *1329 time be pending”; an issue that is linked only by pure supposition to an imaginary future matter (including an investigation) cannot qualify as one that may, in any meaningful sense, be “pending” before an official, now or at “any time” in the future.
Exactly how developed an issue must be before it qualifies as possibly pending or able to be brought by law is something we need not decide. As already discussed, the scenario presented to Valdes gave neither him, nor any other police officer, any reason for official investigation of the individuals for whom Blake sought license number or warrant information. To say that in this context there was a “matter” that might “by law be brought” before some official is to render the statute an archetypical “meat axe.”
A related objection is that the answers that Valdes gave to Blake — in a more general sense, the release of information— constitute the requisite “decision[s] or action[s] on” some stage of a hypothetical future investigation. This too has an over-breadth problem — what question, on any topic, can we say with confidence could never be part of any hypothetical investigation?
Except in limited circumstances (of which those discussed below are a clear example), we do not believe that a release of information can constitute a “decision or action on any question, matter, cause, suit, proceeding or controversy.” Sun-Diamond itself addressed the question of whether “a group of farmers would violate § 201(c)(1)(A) by providing a complimentary lunch for the Secretary of Agriculture in conjunction with his speech to the farmers concerning various matters of USDA policy.” 526 U.S. at 407, 119 S.Ct. 1402. Those policy matters were undoubtedly “question[s][or] matter[s]” that were “pending, or which may by law be brought.” Yet Sim-Diamond at least indirectly rejects the notion that sharing information about them — likely including at least a glimpse into some hitherto nonpublic features of the agency’s decision-making — would violate the statute.
There are, of course, procedures, of which the most prominent are those established by the Freedom of Information Act, under which officials process requests for the release of documents or non-document information, and in doing so take a “decision or action on [a] question, matter, cause, suit, proceeding or controversy.” Thus, for example, a gratuity given for or because of the disposition of a FOIA request (its grant or denial, or the acceleration or retardation of its grant or denial, or any skewing of the terms of its grant or denial) must run afoul of the statute. But it cannot follow that every question-and-answer between an official and a citizen can be brought within the statute by simply characterizing it as an “action on” a matter that “may by law be brought” before a hypothetical FOIA official. (Many such Q-and-As, including perhaps those of Blake and Valdes, however, might qualify as acts “in violation of the official duty” of the official, for purposes of the bribery provision.) Again, any construction embracing such queries would smack of the meat axe. Further, in such a reading the statute would punish the disclosure of public information more severely than other, more targeted statutes punish the disclosure of confidential information. Compare the statute here, 18 U.S.C. § 201(c)(1)(B) (permitting imprisonment of no more than two years), with 18 U.S.C. § 1905 (permitting imprisonment of no more than one year for disclosing certain types of confidential information acquired by an officer in the course of employment). Thus, unless there is something more than the ubiquitous abstract possibility that events might trigger a statutorily prescribed dis *1330 closure process, an information disclosure is not in itself a “decision or action on [a] question, matter, cause, suit, proceeding or controversy” that “may by law be brought” before a public official. While the exact location of this line may prove difficult, the colloquies between Valdes and Blake fall far short of being even a start of the sort of process exemplified by FOIA.
* * :.k í¡: :\i *
Because the government failed to show that the payments received by Valdes were for any “decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official,” as required by 18 U.S.C. § 201, the judgment of conviction is

Reversed.

. Pace Judge Garland's Dissent at 25, we were plainly speaking of the statute's gratuity and not its bribery provisions, as the case involved no claim of bribery.

. Can anyone — including my colleagues in the majority — seriously contend that the Supreme Court would have added to its list of “absurdities” cash payments totaling at least $400 to Valdes for his actions?