# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued September 28, 2006          Decided February 9, 2007

No. 03-3066

NELSON VALDES,
APPELLANT

V.

UNITED STATES OF AMERICA,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 01cr00154-01)

*Paul H. Zukerberg* argued the cause and filed the briefs for appellant.

*Blair G. Brown* and *Barak Cohen* were on the brief for *amicus curiae* the National Association of Criminal Defense Lawyers in support of appellant.

*Lisa H. Schertler*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Kenneth L. Wainstein*, U.S. Attorney at the time the brief was filed, and *Roy W. McLeese, III* and *J. Patrick Rowan*, Assistant U.S. Attorneys.

*J. Gerald Hebert* was on the brief for *amicus curiae* Campaign Legal Center in support of appellee.

Before: GINSBURG, *Chief Judge,* SENTELLE, HENDERSON, RANDOLPH, ROGERS, TATEL, GARLAND, BROWN, GRIFFITH, and KAVANAUGH, *Circuit Judges*, and EDWARDS and WILLIAMS, *Senior Circuit Judges.*

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

Concurring opinion filed by *Circuit Judge* KAVANAUGH, with whom *Senior Circuit Judge* WILLIAMS joins.

Dissenting opinion filed by *Circuit Judge* HENDERSON, with whom *Circuit Judge* RANDOLPH joins.

Dissenting opinion filed by *Circuit Judge* GARLAND, with whom *Circuit Judges* SENTELLE, HENDERSON, RANDOLPH, and BROWN join.

WILLIAMS, *Senior Circuit Judge*: An FBI informant working undercover gave cash to Nelson Valdes, then a detective with the D.C. Metropolitan Police Department ("MPD"). The cash was apparently a reward for Valdes's searching several police databases to supply otherwise publicly available information to the informant. Based on these exchanges, Valdes was convicted under 18 U.S.C. § 201(c)(1)(B) of three counts of receiving an illegal gratuity "for or because of an[] official act." Valdes argues that the statute is far less sweeping than the government successfully claimed in district court, and that, under a proper construction, the government's evidence was insufficient to show that either his database queries or the release of the resulting information constituted an "official act" under the statute. He makes a number of other claims, including attacks on two related aspects of the jury instruction.

A panel of the court agreed that under a correct analysis of the statute the evidence was insufficient, and accordingly reversed the judgment; the panel did not reach Valdes's other claims. *United States v. Valdes*, 437 F.3d 1276 (D.C. Cir. 2006). The full court resolved to hear the case *en banc*, on the sufficiency issue and on whether the district judge's charge had correctly defined an "official act." We now decide that the government failed to show that the acts for which Valdes received compensation fell within the scope of § 201(c)(1)(B); our analysis of the statute also makes clear that the jury charge was error. We therefore reverse the conviction.

\* \* \*

On the evening of February 17, 2001 William Blake, working as an undercover informant for the FBI, went on assignment to a Washington, D.C. nightclub called "1223" (located at 1223 Connecticut Avenue, NW). At "1223" Blake was introduced to Valdes as a judge, and Valdes in turn identified himself as an MPD detective. The two met again at "1223" a week later, on which occasion Valdes gave Blake his business card with his cell phone number, "just in case [Blake] ever needed a favor."

On March 17 an FBI agent instructed Blake to see if Valdes would provide him with police information. The FBI then entered the names of five fictitious individuals, along with fictitious addresses and license plate numbers, into state computer databases. That evening, again at "1223," Blake asked Valdes if he could do him a "favor" and look up some license plate numbers, ostensibly to get contact information on individuals who owed him money. Valdes indicated that this would be "no problem" and told Blake to call him on his cell

phone to get the information. On leaving, Blake handed Valdes a $50 bill; no testimony describes the accompanying conversation, if any. Four days later, Blake called Valdes, introducing himself as "the judge," reiterated his earlier request, and provided Valdes with the first license plate number. Valdes then obtained the name and address of the license holder through a query to the Washington Area Law Enforcement System ("WALES"), a computer database linked to state databases. When Blake called back later, Valdes provided him with the name and address. After expressing satisfaction with the information, Blake asked Valdes, "How much [do] I owe you for this?" and Valdes responded, "Just a thank-you."

Two days later, on March 23, Blake called Valdes again and asked him to run a second license plate query, which Valdes agreed to do. Blake proposed that they meet the next day in person; as Blake testified by way of explanation, a meeting would enable him to offer Valdes money: "I couldn't push [money] through the phone." The FBI equipped Blake for the meeting with a gold Rolex and a Mercedes-Benz automobile with audio and video recorders; it is unclear what the handlers' purpose was in outfitting the phony judge with these luxury items. Blake and Valdes arranged to meet at a local gas station, where Blake handed Valdes $200 and asked him to run a third license plate. Valdes provided Blake with the names and addresses for the second and third plates that evening over the phone, again having obtained the information via WALES.

On March 30, Blake asked Valdes to run a fourth license plate. The two agreed to meet the next day at the same gas station; there, Blake paid Valdes $100 upon receiving the fourth name and address, again obtained via WALES. Blake

also asked Valdes to check whether a friend of Blake's "ha[d] a warrant," handing Valdes an additional $100 to "give you a little more incentive." Valdes again used WALES and that night told Blake that there was no warrant out on the person.

Valdes was indicted on three counts of bribery, in violation of 18 U.S.C. § 201(b)(2)(A) and (C). A jury convicted him of three counts of the lesser-included offense of receipt of an illegal gratuity, in violation of 18 U.S.C. § 201(c)(1)(B).

* * *

We review the sufficiency of the evidence *de novo*, considering it in the light most favorable to the government, to determine whether any rational trier of fact could have found Valdes guilty beyond a reasonable doubt of all the required elements of the crime. See *United States v. Schaffer*, 183 F.3d 833, 839-40 (D.C. Cir. 1999).

The anti-gratuity statute provides that:

Whoever . . . being a public official . . . otherwise than as provided by law for the proper discharge of official duty, directly or indirectly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally for or because of any official act performed or to be performed by such official . . . shall be fined under this title or imprisoned for not more than two years, or both.

18 U.S.C. § 201(c)(1)(B). An "official act" is defined for these purposes as

[1] any decision or action [2] on any question, matter, cause, suit, proceeding or controversy, [3] which may at any time be pending, or which may by law be brought [4] before any public official, in such official's official capacity . . . .

18 U.S.C. § 201(a)(3). Unlike most of § 201's anti-bribery provisions, the anti-gratuity provision has no requirement that the payment actually "influence[] . . . the performance" of an official act. Compare, e.g., 18 U.S.C. § 201(b)(2)(A). Conversely, the bribery provisions reach a number of additional "predicate acts," most notably an official's "act in violation of . . . lawful duty," 18 U.S.C. § 201(b)(1)(C); see also *id.* § 201(b)(2)(C) ("in violation of . . . official duty"), not covered in the gratuity ban.

The government maintains that the bribery and gratuity statute should be construed broadly, to encompass essentially any action which implicates the duties and powers of a public official. At oral argument, counsel argued that the specific requirements of 18 U.S.C. § 201(a)(3) are "equivalent" to a statute that would simply prohibit "any decision or action within the scope of the official's authority." Transcript of Oral Argument at 35. This view, the government argues, is consistent with the Supreme Court's statement that "[e]very action that is within the range of official duty comes within the purview of these sections." *United States v. Birdsall*, 233 U.S. 223, 230 (1914). To the extent that the statutory clause modifying "decision or action," namely, "on any question, matter, cause, suit, proceeding or controversy," constitutes limiting language (a point the government does not concede), the government alleges that it is not relevant here: Valdes's searches and disclosures constitute plain "actions" on clear "questions," namely, "Who owns this license plate and where

does he or she live?" and "Does this man have an outstanding arrest warrant?" Appellee's Br. 29.

The government's position, however, both misinterprets the Supreme Court and ignores the plain text of the statute. Whatever the broad language in *Birdsall* may mean, it was certainly not the Court's holding. In *Birdsall*, the Court was focused on rejecting the defendants' theory on appeal—that for conduct to qualify as an "official act" it must be one "prescribed by statute," 233 U.S. at 231, as one of the decisions under review had held, see *United States v. Birdsall*, 206 F. 818, 821 (D. Iowa 1913); see also *United States v. Van Wert*, 195 F. 974, 977 (D. Iowa 1912) (arguably imposing an even more stringent test, saying that "unless the act . . . is a violation of some act of Congress . . . or of some departmental rule or regulation authorized by Congress . . . no crime has been committed."). Rejecting this very narrow definition, the Court held simply that "[i]n numerous instances, duties not completely defined by written rules are clearly established by settled practice, and action taken in the course of their performance must be regarded as within the provisions of the above-mentioned statutes against bribery." *Birdsall*, 233 U.S. at 231. *Birdsall* did not, however, stand for the proposition that every action within the range of official duties *automatically* satisfies § 201's definition; it merely made clear the coverage of activities performed as a matter of custom.

More useful to this case is the Supreme Court's observation in *United States v. Sun-Diamond Growers*, 526 U.S. 398 (1999), that § 201(c) was "merely one strand of an intricate web of regulations, both administrative and criminal, governing the acceptance of gifts and other self-enriching actions by public officials." *Id*. at 409. The Court went on to

say that § 201(c)'s context warranted a specific interpretive approach:

> [T]he numerous . . . regulations and statutes littering this field[] demonstrate that this is an area where precisely targeted prohibitions are commonplace, and where more general prohibitions have been qualified by numerous exceptions. Given that reality, a statute in this field that can linguistically be interpreted to be either a meat axe or a scalpel should reasonably be taken to be the latter.

*Id.* at 412. In *Sun-Diamond*, this adjuration led the Court to reject the government's theory that 18 U.S.C. § 201(a)(3) covers any action taken in an official capacity. While numerous activities—hosting a ceremony, visiting a school, or delivering a speech, for example—"are assuredly 'official acts' in some sense," *id.* at 407, it would be "absurd[]," the Court said, to consider them within the scope of § 201, *id.* at 408. *Sun-Diamond*'s interpretive gloss, like the rule of lenity, thus works to protect a citizen from punishment under a statute that gives at best dubious notice that it has criminalized his conduct.

Importantly for our purposes, the *Sun-Diamond* Court reached its conclusion "through the definition of [the] term ['official act']," *id.* (emphasis altered), and, in particular, through a clause that the government seems quick to ignore here, namely "on any question, matter, cause, suit, proceeding or controversy." At a minimum the government's interpretation of this six-term series is overly expansive, extending the statute to any action that in effect answers any question. More broadly, the government's theory reads the series out of the statute entirely. Neither position squares with

*Sun-Diamond*'s direction or gives effect to all of the statutory language.

In contrast, relying on the canon of *noscitur a sociis*, we believe that the words "question" and "matter" are known by the company that they keep. See, e.g., *Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 399-401 (D.C. Cir. 2004) (describing the canon); see also *United States v. Menasche*, 348 U.S. 528, 538 (1955) ("The cardinal principle of statutory construction is to save and not to destroy.") (internal quotation omitted); *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 573-75 (1995) (applying *Menasche*'s principle). Seen in that light, the six-term series refers to a class of questions or matters whose answer or disposition is determined by the government. That class includes such questions as "Should the Congress enact new legislation regulating corporate directors?," "Should this person be prosecuted?," and "What firm should supply submarines for the Navy?" But it would not include questions like "What is your name?," an issue that the government does not normally resolve.

Our reading of the statute is buttressed by the elements immediately preceding and following the six-term series. It would be linguistically odd, at a minimum, to treat an answer to a question as a "decision or action on" a question unless the answer were one that the government had authority to decide. The same holds true of the clause requiring that such questions or matters be of a class which "may at any time be pending, or which may by law be brought before any public official." Questions not subject to resolution by the government are not ordinarily the kind that people would describe as "pending" or capable of being "by law . . .

brought" before a public official, especially if the law imposes no mandate on the official (or perhaps any official) to answer.

Our interpretation of the statute squares with this court's earlier decision in *United States v. Muntain*, 610 F.2d 964 (D.C. Cir. 1979), where we found that the defendant, an Assistant to the Secretary for Labor Relations at the Department of Housing and Urban Development ("HUD"), had not accepted illegal gratuities for an official act when he received compensation from private persons for selling private auto insurance schemes to labor unions with whose leaders he also dealt on official HUD business. In doing so we characterized the government as asking the court to "construe 18 U.S.C. § 201(g) [prior version of § 201(c)(1)(B)] as a statutory prohibition against the misuse of public office and contacts gained through that office to promote private ends," *id.* at 967; we plainly rejected that construction. Nor were we ready to read the statute as barring Muntain's corralling his subordinates into his insurance promotion enterprise, given the absence of any behavior meeting the statutory definition of "official act." *Id.* at 969. Affirmatively, we said that "[i]t is the corruption of official decisions through the misuse of influence in governmental decision-making which the bribery statute makes criminal." *Id.* at 968.[1] Understandably, the dissenters' brief discussion of the *Muntain* decision fails to explain what distinguishes Muntain's case (the use of government property and his own subordinates to offer private deals to union officials, with whom it was his job to deal on

---

[1] *Pace* Judge Garland's Dissent at 25, we were plainly speaking of the statute's gratuity and not its bribery provisions, as the case involved no claim of bribery.

official matters) from Valdes's (use of government resources to answer Blake's questions).

Thus, both our precedent and the language of the statute make clear that § 201 is not about officials' moonlighting, or their misuse of government resources, or the two in combination. Even apart from the anti-bribery statute (which we discuss below in addressing the dissenters), numerous other regulations and statutes prohibit these activities. See, e.g., 18 U.S.C. § 641 (prohibiting the conversion of government property); 5 U.S.C. § 7353 (restricting federal employees' acceptance of gifts); 18 U.S.C. § 2721 (limiting disclosure—not only by state employees but by other "authorized recipient[s]"—of personal information such as a driver's address contained in state motor vehicle records); cf. D.C. Code § 22–704 (prohibiting gratuities which cause an "official to execute any of the powers in such official vested . . . otherwise than is required by law"). And though the likelihood that Valdes violated these other statutes implies nothing direct about his culpability under § 201, their existence underscores an observation in *Sun-Diamond*: "Absent a text that clearly requires it, we ought not expand this one piece of the regulatory puzzle so dramatically as to make many other pieces misfits. . . . [N]ot only does the text here not require that result; its more natural reading forbids it." 526 U.S. at 412.

Having defined the statute's domain negatively, we nonetheless emphasize that today's decision is in no way at odds with numerous other cases finding liability under § 201. By focusing on those questions, matters, causes, suits, proceedings, and controversies that are decided by the government, our interpretation of the statute easily covers: a clerk's manufacture of official government approval of a

Supplemental Security Income benefit, as in *United States v. Parker*, 133 F.3d 322 (5th Cir. 1998); a congressman's use of his office to secure Navy contracts for a ship repair firm, as in *United States v. Biaggi*, 853 F.2d 89 (2d Cir. 1988); and a Veterans' Bureau official's activity securing a favorable outcome on a disability claim, as in *Beach v. United States*, 19 F.2d 739 (8th Cir. 1927) (based on a predecessor statute). All of those cases are clearly covered by the statute because they concern inappropriate influence on decisions that the government actually makes. Questions like "Should this person receive a contract or disability benefit, and for how much?" are simply in a different class from questions like "Where do you live?" and "What kind of car do you drive?" Section 201(a)(3) clearly encompasses the former, but not the latter.

Our understanding of the term "official act" is thus in stark contrast to the definition given in the post-trial jury instructions:

> The term "official act" means any decision or action within the scope of the public official's authority. The term "official act" includes the decisions or actions generally expected of a public official such as a police officer. These decisions or actions do not need to be specifically described by law, rule, or job description to be considered an official act. Similarly, the term official duty is not limited to a duty imposed by law or statute, but includes any duty lawfully imposed in any manner by settled practice within the government agency.

Over the explicit objection of the defendant, the court refused to include either the statutory language on which we have focused—the definition of "official act"—or anything

comparable. In light of our interpretation of the statute, this was error—and by no means harmless error. Cf. *United Mine Workers v. Pennington*, 381 U.S. 657, 670 (1965) ("Such conduct is not illegal . . . . The jury should have been so instructed and . . . we cannot hold this lapse to be mere harmless error.").

\* \* \*

Our dissenting colleagues suggest that Valdes's queries violate § 201(c)(1)(B) because they constitute a police investigation. We share an important premise of this argument, namely the proposition that a police investigation is in the same class of processes as a "question, matter, cause, suit, proceeding or controversy." "Should the police investigate this person?," for example, is clearly a question answered by the government. Providing or receiving gifts for or because of decisions to initiate, accelerate, retard, conclude, or skew such an investigation is unquestionably conduct prohibited by § 201.

Simply stating that police investigations are covered by the bribery and gratuity statute does little to resolve the case, however. While there does not appear to be any direct precedent on the point, it seems implausible to assert that *any* interrogative action done by an officer using government resources constitutes an action on an "investigation" of the kind which would be covered by § 201(c). The dissenters are able to reach the contrary conclusion only because of their readiness both to disaggregate the activities that may be undertaken as part of an "investigation," and to generalize them. Of course "many police investigations are quite brief." Judge Garland's Dissent at 8. And asking questions (of

people, databases, and real evidence) is certainly a part of investigating. *Id*. at 8-9. But it would constitute an enormous expansion of the gratuities provision to define "action" on a "matter" as encompassing every question asked and answered, or even every question that somehow parallels those an official might ask as part of his official duty and whose answer might entail a use of government resources. It would bring under the clause a broad range of moonlighting activities that in *any way* paralleled an official's regular work (and perhaps that of a broad spectrum of fellow workers, as well). Thus, a Department of Justice lawyer who used a government Westlaw account to look up a legal question for a friend would be, in the dissenters' view, "deci[ding]" a "question" that might "be brought before [him]." This goes too far—and the dissenters do not define the outer bounds of their theory. See *id*. at 19.

At the very least, we believe that a police officer's ascertainment of answers to questions cannot amount to a "decision or action" on an investigation unless the ascertainment itself, or other activity in the real world, could have some prospect of bringing about (or, for that matter, squelching or redirecting) some sort of government investigation. Certainly Valdes's behavior is a far cry from that found illegal in *United States v. Carson*, 464 F.2d 424 (2d Cir. 1972), where the investigation at issue was already underway, see *id*. at 426, or in *United States v. Ahn*, 231 F.3d 26 (D.C. Cir. 2000), where the police officer defendant visited illegally operated massage parlors and, in lieu of reporting the violations as duty required, secured payments from the parlors' operators, see *id*. at 32. Valdes's queries belonged to no such active or incipient police investigation.

The dissenters mistakenly assert or at least imply that our decision will have two adverse consequences: first, that it will narrow the range of available "sting" operations against corrupt public officials, see Judge Garland's Dissent at 9-11, and second, that many "successful bribery prosecutions under [§ 201(b)(2)(A)]—which depend upon the same definition of 'official act' as gratuity prosecutions—would not be possible" after our decision, *id*. at 11. Both concerns are quite ill-founded.

Our decision has no effect on law enforcement's ability to conduct "sting" operations. The government's problem is not that Valdes's queries involved purely fictional people. Even if Blake had sought license plate and warrant information about *real* people, that fact would not have transformed his five questions, or Valdes's answers, or both, into a government investigation, or any other kind of "matter," etc., covered by § 201(a)(3); those actions had no relationship whatsoever even to a fictional government investigation. Conversely, inveigling a suspect into a "sting" investigation can generate criminal behavior under our reading of the statute. Had government agents created an apparent drug investigation scenario, and had Blake asked Valdes to add or subtract specific individuals to be questioned, and paid him "for or because of" Valdes's compliance, the "sting" character of the events would not absolve Valdes.

It is equally alarmist to suggest that our decision will somehow render bribery prosecutions difficult to pursue. It is true that the bribery and gratuity provisions overlap in the sense that *one* type of predicate act covered by both provisions is an "official act" as defined in § 201(a)(3). See §§ 201(b)(1)(A) & 201(b)(2)(A) (stating "official act" predicate for bribery, for offeror and recipient of bribe,

respectively). But the bribery provisions cover two *additional* predicate classes, one of which consists of acts "in violation of the lawful duty of such official or person." See § 201(b)(1)(C); see also § 201(b)(2)(C) ("in violation of the official duty of such official or person"). Though the dissenters attempt to cast doubt on this variation of the bribery prohibition by noting that our court has not yet had occasion to construe "official duty," the many successful prosecutions under that term make reasonably clear that it embraces the dissenters' numerous hypotheticals. See, e.g., *Parks v. United States*, 355 F.2d 167 (5th Cir. 1965) (explicitly finding that defendant's arrangement to pay an Air Force sergeant to sell names of new recruits constituted inducement to do an act in violation of the sergeant's lawful duty); see also *United States v. Cruz*, 946 F.2d 122, 123 (11th Cir. 1991) (defendant convicted under bribery statute for providing an investigative target with "information relating to the IRS and FBI's investigations in exchange for money"); *United States v. Lanci*, 669 F.2d 391 (6th Cir. 1982) (defendant convicted of bribery and conspiracy for his role in arranging to bribe an FBI employee to divulge confidential information, such as the names of FBI informants). Cf. *United States v. Gjieli*, 717 F.2d 968, 974 (6th Cir. 1983) (holding (in the bribery context) that the "official duty" provision is broader than the "official act" provision in that only the latter requires that "the act induced fall within the federal employee's official function"). Our decision therefore plainly continues to allow bribery prosecutions when, for example, someone offers something of value to induce an official to provide information in violation of official duty.

We believe that § 201 thus reflects a kind of balance between the bribery and gratuity violations. For the former, it defines the predicate acts broadly, but the required

compensatory link narrowly; culpability attaches for "any official act," "any fraud," or "any act in violation of [a] lawful duty," but the payment at issue must actually influence the act or omission. See §§ 201(b)(1)-(2). For gratuities, the reverse is true; the predicate acts are defined narrowly (excluding, for instance, mere violation of an official duty), and the required compensatory link is defined more broadly ("for or because of," even where the compensation has had no influence). See § 201(c)(1).

The dissenters suggest that the legislative history undermines this analysis because of a House Report, H.R. Rep. No. 87-748, at 19 (1961), observing that the gratuity provision strikes at conduct with "the appearance of evil." Judge Garland's Dissent at 23. But a generality of this sort seems a weak basis for disregarding the differences in statutory language. When Congress in 1962 reorganized the bribery statute and added an illegal gratuity offense, it could easily have made that provision perfectly mirror all of the predicate acts listed in the older bribery provision; instead, however, it chose to include only the "official act" predicate of 18 U.S.C. § 201(b)(1) & § 201(c)(1) (1964), and *not* the "fraud" or "official duty" predicates of 18 U.S.C. § 201(b)(2)-(3) & § 201(c)(2)-(3) (1964). See 18 U.S.C. § 201(f) & § 201(g) (1964). The textual distinction could not be clearer.

The dissenters then go on to reason that we do "public officials no favor" by effectively eliminating "illegal gratuity" as a lesser included offense of bribery, as it deprives juries of the chance to give defendants a break. Judge Garland's Dissent at 24. This of course disregards all the cases where the behavior meets the predicate act requirements of both statutes. More importantly, our job is not to provide juries with a broad menu of opportunities to punish an "evil act."

We are to interpret the text of the statute as written by Congress. Here, the bribery provision covers a larger set of predicate acts than does the gratuity provision. Judicial extension of those for the gratuity provision would disturb the balance Congress chose—which, of course, it is free to modify at any time. Cf. *United States v. Leyva*, 282 F.3d 623, 625 (9th Cir. 2002) (noting with regard to § 201(b)(2)(B), which prohibits acts of fraud on the United States, that "[t]he absence of any official act requirement is particularly pointed in light of explicit 'official act' or 'official duty' language in other subsections of § 201," and that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (internal citations omitted) (internal quotation omitted).

* * *

Though not squarely raised, a set of arguments closely related to that made by the dissenters requires examination: That even if Valdes's actions do not themselves constitute an "investigation," his queries and disclosures constitute elements of—i.e., "decision[s] or action[s] on"—some *future* investigation that might one day "be brought" before Valdes or another public official.

In line with our previous discussion, simple interrogative activity cannot qualify as a "decision or action on any question, matter, cause, suit, proceeding or controversy" merely because one can imagine that the activity would qualify as such in some imagined investigation that might conceivably "be brought" before some public official. Any

such notion appears to lack a limiting principle; in our context, for example, it would encompass *any* WALES search, even if the officer revealed the results to no one, because that search might one day be relevant to a future investigation. The more natural reading of the "may by law be brought" language would recognize, however, that "question[s], matter[s]" and the like typically can not "by law be brought" before an official until the underlying issue has surfaced to some degree. An obvious case would be a gratuity for an NLRB member offered "for or because of" his hoped-for ruling on a matter then (1) pending before an ALJ or (2) extant in the form of a company's or union's initial charge. Perhaps a live labor dispute with real potential for Board intervention might be enough (we need not decide the point). In all these cases the "matter" that "may by law be brought" before the Board is at least nascent; it is not a pure fiction. The same is true for the clause "may at any time be pending"; an issue that is linked only by pure supposition to an imaginary future matter (including an investigation) cannot qualify as one that may, in any meaningful sense, be "pending" before an official, now or at "any time" in the future.

Exactly how developed an issue must be before it qualifies as possibly pending or able to be brought by law is something we need not decide. As already discussed, the scenario presented to Valdes gave neither him, nor any other police officer, any reason for official investigation of the individuals for whom Blake sought license number or warrant information. To say that in this context there was a "matter" that might "by law be brought" before some official is to render the statute an archetypical "meat axe."

A related objection is that the answers that Valdes gave to Blake—in a more general sense, the release of information—constitute the requisite "decision[s] or action[s] on" some stage of a hypothetical future investigation. This too has an overbreadth problem—what question, on any topic, can we say with confidence could never be part of *any* hypothetical investigation?

Except in limited circumstances (of which those discussed below are a clear example), we do not believe that a release of information can constitute a "decision or action on any question, matter, cause, suit, proceeding or controversy." *Sun-Diamond* itself addressed the question of whether "a group of farmers would violate § 201(c)(1)(A) by providing a complimentary lunch for the Secretary of Agriculture in conjunction with his speech to the farmers concerning various matters of USDA policy." 526 U.S. at 407. Those policy matters were undoubtedly "question[s] [or] matter[s]" that were "pending, or which may by law be brought." Yet *Sun-Diamond* at least indirectly rejects the notion that sharing information about them—likely including at least a glimpse into some hitherto non-public features of the agency's decision-making—would violate the statute.

There are, of course, procedures, of which the most prominent are those established by the Freedom of Information Act, under which officials process requests for the release of documents or non-document information, and in doing so take a "decision or action on [a] question, matter, cause, suit, proceeding or controversy." Thus, for example, a gratuity given for or because of the disposition of a FOIA request (its grant or denial, or the acceleration or retardation of its grant or denial, or any skewing of the terms of its grant or denial) must run afoul of the statute. But it cannot follow

that *every* question-and-answer between an official and a citizen can be brought within the statute by simply characterizing it as an "action on" a matter that "may by law be brought" before a hypothetical FOIA official. (Many such Q-and-As, including perhaps those of Blake and Valdes, however, might qualify as acts "in violation of the official duty" of the official, for purposes of the bribery provision.) Again, any construction embracing such queries would smack of the meat axe. Further, in such a reading the statute would punish the disclosure of public information more severely than other, more targeted statutes punish the disclosure of confidential information. Compare the statute here, 18 U.S.C. § 201(c)(1)(B) (permitting imprisonment of no more than two years), with 18 U.S.C. § 1905 (permitting imprisonment of no more than one year for disclosing certain types of confidential information acquired by an officer in the course of employment). Thus, unless there is something more than the ubiquitous abstract possibility that events might trigger a statutorily prescribed disclosure process, an information disclosure is not in itself a "decision or action on [a] question, matter, cause, suit, proceeding or controversy" that "may by law be brought" before a public official. While the exact location of this line may prove difficult, the colloquies between Valdes and Blake fall far short of being even a start of the sort of process exemplified by FOIA.

\* \* \*

Because the government failed to show that the payments received by Valdes were for any "decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought

before any public official," as required by 18 U.S.C. § 201, the judgment of conviction is

*Reversed.*

KAVANAUGH, *Circuit Judge*, with whom *Senior Circuit Judge* WILLIAMS joins, concurring:  I join the majority opinion and add two brief points.

*First*, the facts and circumstances of this case are unusual, and as the majority opinion indicates, the Court's ruling on Valdes's case will not thwart future prosecutions of money-for-information-disclosure.  After today's decision, just as before today's decision, a covered public official who in violation of official duty corruptly provides information in return for something of value commits a federal crime: bribery.

The amount of ink spilled on this case is largely a result of the jury's divided verdict, as well as small but key differences in the textual scope of the bribery and illegal gratuities statutes. Valdes was indicted solely for bribery – namely, disclosing certain information in exchange for a few hundred dollars.  At trial, the prosecutor forcefully argued that the defendant was guilty of bribery, stating in his closing argument, for example, that "For a few hundred dollars, ladies and gentlemen, this police officer was bought, and those few hundred dollars were bribes."  At the close of evidence, the district judge properly found that the evidence legally sufficed for the jury to find Valdes guilty of bribery – that Valdes in violation of his official duty disclosed information in exchange for money.  But then the jury was instructed on the bribery *and* illegal gratuities statutes. Instructed on both statutes, the jury split the difference by acquitting on bribery and convicting on illegal gratuities (illegal gratuities carries lighter penalties than bribery).  That divided verdict has created a problem on appeal because the plain text of the bribery statute actually applies to a broader range of activities – such as disclosing information – than does the gratuities statute.  In other words, even though a jury lawfully could have found Valdes guilty of bribery (as the district judge concluded), we obviously cannot review the jury's acquittal on that charge.  And even though the jury convicted Valdes of illegal gratuities, the majority opinion correctly concludes that

conviction cannot stand because Valdes's actions were not covered by the text of the gratuities statute (a conclusion supported by the Supreme Court's strong and unanimous statements in *Sun-Diamond* regarding the gratuities statute).

The background of this case underscores a key practical consequence of today's decision:  In the typical future prosecution of money-for-information-disclosure, the jury will be instructed *only* on bribery – and the scenario in which a defendant's case slips through the cracks because of a split-the-difference jury verdict will not recur.

*Second*, given that opinions in cases like this one often are relied on by the hundreds of thousands of covered federal officials and those who advise them on ethics issues, another point warrants mention.  Both the bribery and gratuities statutes require the prosecution to show some nexus between a gift and a covered official action.  But public officials would be foolish to assume the statutes really allow them that much room to accept gifts.  When they become aware of questionable gifts to a public official, investigators tend to turn over many stones trying to determine whether the gifts were linked to the public official's actions.  And even without direct smoking-gun evidence, prosecutors can prove such links with only circumstantial evidence.  Covered public officials who want to stay clearly on the safe side of the criminal-law line (not to mention comply with the phalanx of non-criminal regulatory provisions in this area) therefore would be well-advised not to accept certain gifts in the first place, rather than pinning their hopes on after-the-fact arguments premised on statutory terms such as "in return for" or "official act" or "official duty."  In other words, absent an authorization or exception, public officials might decline monetary gifts and ensure that trips, tickets, and the like are paid for by the officials themselves, by the government when so allowed, or (in the case of elected

officials) by a campaign or political committee when so allowed. That's certainly simpler, cleaner, and cheaper than attempting to argue afterwards that a particular gift was not linked to an official action.

KAREN LeCRAFT HENDERSON, *Circuit Judge*, with whom RANDOLPH, *Circuit Judge*, joins, dissenting:

In my dissent from the vacated panel decision, *see United States v. Valdes*, 437 F.3d 1276, 1282-88 (D.C. Cir. 2006), I previously expressed my profound disagreement with the majority's interpretation of the meaning of "official act" as defined in 18 U.S.C. § 201(a)(3). While I fully join Judge Garland's excellent dissent, I write separately to elaborate on two points I made earlier.

First, and most important, *stare decisis* requires us to comply with the United States Supreme Court's broad interpretation of the term "official act" as set forth in *United States v. Birdsall*, 233 U.S. 223 (1914). In *Birdsall*, the precursor statute to section 201(a)(3) made it illegal for an official to accept money given with the intent to influence "his decision or action" "on any question, matter, cause, or proceeding which may at any time be pending, or which may by law be brought before him in his official capacity." Crim. Code §§ 39, 117, 35 Stat. 1096, 1109-10 (1909). The Supreme Court held that an "official action" need not be "prescribed by statute" and includes an action "clearly established by settled practice," *Birdsall*, 233 U.S. at 231, declaring that "[e]very action that is within the range of official duty comes within the purview of" the statute, *id.* at 230. It is hard to imagine a broader statutory reach than the language of the precursor statute.[1] And we are likewise bound to give the successor statute—containing almost verbatim the all-inclusive language—the same reach until and unless directed to do otherwise. *See Welch v. Tex. Dep't of Highways & Pub. Transp.*, 483 U.S. 468, 478-79 (1987) ("The rule of law depends in large part on adherence to the doctrine of *stare decisis*. . . . It follows that any departure from the doctrine of *stare decisis*

---

[1]Nevertheless, the current version *adds* "suit" and "controversy" to the list of undertakings. *See* 18 U.S.C. § 201(a)(3).

demands special justification." (internal quotation omitted)). The Supreme Court has never *expressly* overruled, watered down or otherwise retreated from *Birdsall*.[2]  Nor do I believe the Court has done so *sub silentio* in *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398 (1999).

*Sun-Diamond* is a spectacular red-herring in this case.  *Sun-Diamond* addressed "whether conviction under the illegal gratuity statute requires any showing beyond the fact that a gratuity was given because of the recipient's official position." *Id.* at 400.  The Court rejected the idea that section 201(c)(1)(A) "requires only a showing that a gift was motivated, at least in part, by the recipient's *capacity to exercise governmental power or influence* in the donor's favor without necessarily showing that it was connected to a particular official act," *id.* at 405-06 (emphasis in original) (internal quotation omitted), holding instead that "[t]he insistence upon an 'official act,' carefully defined, seems pregnant with the requirement that some *particular official act* be identified and proved," *id.* at 406 (emphasis added).  The Court did not, however, rule on the statutory definition of "official act" or even mention *Birdsall*. It simply referenced section 201(a)(3) in dicta after acknowledging that the "official act" required by section 201(c)(1)(A) could produce "peculiar results," such as criminalizing the President's receipt of a sports jersey for a

---

[2]Indeed, our court and several of our sister circuits have over the years cited *Birdsall*'s broad language approvingly.  *See United States v. Muntain*, 610 F.2d 964, 967-68 n.3 (D.C. Cir. 1979) (endorsing *Birdsall*'s broad language notwithstanding its inapplicability to challenged actions); *see also United States v. Parker*, 133 F.3d 322, 326 (5th Cir. 1998); *United States v. Gjieli*, 717 F.2d 968, 974-75 (6th Cir. 1983); *United States v. Carson*, 464 F.2d 424, 433-34 (2d Cir. 1972); *Wilson v. United States*, 230 F.2d 521, 524 (4th Cir. 1956).

ceremonial White House visit, the Education Secretary's receipt of a school baseball cap for a school visit or the Agriculture Secretary's complimentary lunch for his speech to farmers. *Id.* at 407. The Court explained, "[T]hose actions—while they are assuredly 'official acts' in some sense—are not 'official acts' within the meaning of the statute," *id.*, and concluded, "[W]hen the violation is linked to a particular 'official act,' it is possible to eliminate the absurdities *through the definition of that term*," *id.* at 408 (emphasis in original). Other than iterating the term's full statutory definition, the Court added nothing to the "*definition of that term*."[3] *Id.* at 407-08. And it most certainly did not jettison precedent that is over ninety years old and intact. The majority's summary dismissal of *Birdsall*, Maj. Op. at 7, in favor of an insupportable application of *Sun-Diamond* violates our duty to faithfully apply precedent. *See Agostini v. Felton*, 521 U.S. 203, 237 (1997) ("[I]f a precedent of [the Supreme Court] has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme Court] the prerogative of overruling its own decisions." (internal quotations omitted) (alteration added)); *cf. Eberhart v. United States*, 126 S. Ct. 403, 407 (2005) (applauding Seventh Circuit for following Supreme Court precedent as "prudent course" rather than either "forc[ing] the issue by upsetting what [it] took to be our settled precedents" or "bur[ying] the issue by proceeding in a summary fashion").

---

[3]On this point, the majority's conclusion that "the *Sun-Diamond* Court reached its conclusion 'through the definition of [the] term ['official act'],'" Maj. Op. at 8 (quoting *Sun-Diamond*, 526 U.S. at 408), and "in particular, through [the] clause . . . 'on any question, matter, cause, suit, proceeding or controversy,'" *id.* at 8 (quoting 18 U.S.C. § 201(a)(3)) (final alteration added), is flatly wrong.

4

Not only can the *Sun-Diamond* dicta not bear the weight the majority saddles it with, the dicta does no more than acknowledge "the venerable maxim *de minimis non curat lex* ('the law cares not for trifles') [which] is part of the established background of legal principles against which *all enactments* are adopted, and which *all enactments* (absent contrary indication) are deemed to accept." *Wis. Dep't of Rev. v. William Wrigley, Jr., Co.*, 505 U.S. 214, 231 (1992) (last two emphases added). That is, the "absurdities" described in *Sun-Diamond* constitute nothing other than *de minimis* exceptions.[4] *See Sun-Diamond*, 526 U.S. at 408.

The second point is that this is a simple—but far from inconsequential—case. The man on the street grasps what my colleagues in the majority so inexplicably resist: you cannot lawfully give money to a law enforcement officer for performing a function of his office. I respectfully dissent.

---

[4]Can anyone—including my colleagues in the majority—seriously contend that the Supreme Court would have added to its list of "absurdities" cash payments totaling at least $400 to Valdes for his actions?

GARLAND, *Circuit Judge*, with whom *Circuit Judges* SENTELLE, HENDERSON, RANDOLPH, and BROWN join, dissenting:

A guy walks into a bar. He meets a police detective, asks him to search a law-enforcement database for the names and home addresses of individuals holding certain Virginia automobile license plates, and then hands the detective some cash. He gives the detective more cash after the detective provides the information, and still more as an "incentive" to determine whether a "friend" of his has an outstanding arrest warrant in New York. The guy -- who wears a gold Rolex, drives a leased Mercedes-Benz, will meet only at night at a local gas station, and advises the detective to "read between the lines" -- tells the detective that he is a "federal judge." He says that he wants the information because "these f***ing people owe me a lot of money."

The detective cannot know who the "judge" really is, or why he wants the information. He cannot know whether the "judge" is a loan shark seeking to find and punish his debtors, or whether he wants the information because the individuals are his associates in a criminal enterprise, police officers who are surveilling him, witnesses against him, or targets of identity theft. The detective is wary: he uses another officer's code to access the restricted database and then runs the license number of the "judge's" own Mercedes, learning only that the Mercedes is leased. Nonetheless, in the end he takes the cash -- repeatedly -- and gives the "judge" the information he seeks.

For these acts, a jury convicted the detective of accepting an illegal gratuity -- to put it bluntly, a "payoff." Today, the court reverses the conviction on the ground that accepting such a gratuity does not constitute a crime. Because the court's decision is wrong, and because it undermines the prosecution of public corruption, I respectfully dissent.

I

Both the facts and the law relevant to this case are straightforward.

A

The defendant is the aforementioned police officer, Metropolitan Police Department (MPD) detective Nelson Valdes. The "judge" is William Blake, an undercover informant for the FBI. After meeting Detective Valdes at a District of Columbia nightclub, Blake gave Valdes several Virginia license plate numbers and asked him to find out the names and addresses of the holders of those plates. Blake told Valdes that he would "take care of [him]," and that Valdes could "make [himself] a few dollars." Joint Exhibit Appendix (J.E.A.) 109, 111. Upon leaving the nightclub, Blake handed Valdes a $50 bill.

After taking the precautions noted in the introduction to this opinion, Valdes ran the license plate numbers through the Washington Area Law Enforcement System (WALES), a restricted police database that officers are authorized to use for law enforcement purposes only,[1] and that serves as an interface to the national law enforcement database known as the National

---

[1]*See* MPD General Order 302.6, at 6 (J.E.A. 94) ("Information from WALES [and] NCIC . . . shall be used for official legitimate law enforcement purposes only."); *id.* (stating that MPD employees "making inquiries or receiving information on the Wales or [Regional Arrest Information Network] terminal[s] shall take extraordinary precautions to ensure that this information is not observable to unauthorized persons"); *United States v. Jordan*, 316 F.3d 1215, 1222 (11th Cir. 2003) ("Access to . . . NCIC is circumscribed by strict rules requiring that [it] be utilized for law enforcement purposes only.").

Crime Information Center (NCIC).[2] Valdes told Blake that he would have to run the plates "one at a time," because "they monitor this stuff." J.E.A. 111. Valdes' WALES searches produced the names, home addresses, and Social Security numbers of the license plate holders, all of which were fictions that the FBI had previously entered into the database in preparation for the undercover operation. Valdes gave the names and home addresses to Blake, who gave Valdes $200 on one occasion and $100 on another. Blake also asked Valdes to find out whether a "friend" had an outstanding arrest warrant in New York, giving him another $100 as "a little more incentive." J.E.A. 121-22; Joint Appendix (J.A.) 281. NCIC indicated that there was no outstanding warrant for Blake's "friend" -- also a fiction -- and Valdes so advised Blake. J.E.A. 127 (recording of Valdes informing Blake that, "[a]ccording to the NCIC check, nothing comes back").

---

[2]WALES "contains criminal history information regarding arrests, address information, physical description (race, sex, date of birth, height, weight, any scars or markings), police and correctional identification numbers, and warrant information. It also contains motor vehicle information (driver's licenses, vehicle registrations, vehicle identification numbers), social security numbers, aliases, fingerprint classifications, warnings about particular persons, and attempts to locate both missing cars and people. In addition, 'WALES' interfaces with several other law enforcement records systems, including the National Law Enforcement Telecommunication System ('NLETS'), which allows an exchange of information between individual State databases and is maintained by the Federal Bureau of Investigation ('FBI'); the Criminal Justice Information System ('CJIS'), which contains arrest information from the police district[s] . . . , and the National Crime Information Center ('NCIC'), which is maintained by the FBI." *United States v. Hutchinson*, 408 F.3d 796, 799 (D.C. Cir. 2005).

4

For the foregoing conduct, Valdes was charged with accepting a bribe in violation of 18 U.S.C. § 201(b)(2)(A). The jury acquitted him of that charge, but convicted him of the lesser included offense of accepting an illegal gratuity in violation of 18 U.S.C. § 201(c)(1)(B). As the Supreme Court explained in *United States v. Sun-Diamond Growers*, the difference between bribery and gratuity is one of intent. *See* 526 U.S. 398, 404-05 (1999). To be guilty of accepting a bribe, one must "corruptly" receive a payment "in return for . . . being influenced in the performance of any official act." 18 U.S.C. § 201(b)(2)(A). One can be guilty of accepting an illegal gratuity, however, simply for accepting a payment "for or because of" the performance of an official act. *Id.* § 201(c)(1)(B). In other words,

> for bribery there must be a *quid pro quo* -- a specific intent to give or receive something of value *in exchange* for an official act. An illegal gratuity, on the other hand, may constitute merely a reward for some future act that the public official will take (and may already have determined to take), or for a past act that he has already taken.

*Sun-Diamond*, 526 U.S. at 404-05. It is from his conviction for accepting an unlawful gratuity that Valdes appeals.

B

The gratuity subsection of section 201 makes it a crime for a "public official" to "receiv[e]" or "accept[]" "anything of value personally for or because of any official act performed or to be performed by such official." 18 U.S.C. § 201(c)(1)(B). There is no dispute that Valdes was a public official (statutorily defined as including employees of the District of Columbia, *id.* § 201(a)(1)), and that he personally accepted something of value

($450) for or because of the acts he took at Blake's request. The only issue is whether those acts constituted "official act[s]" within the meaning of the statute.

Subsection 201(a)(3) defines "official act" -- for purposes of both the gratuity and the bribery subsections -- to mean "[1] any decision or action[, 2] on any question, matter, cause, suit, proceeding or controversy, which [3] may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit." *Id.* § 201(a)(3). Valdes' conduct satisfies all three parts of the statutory definition. The following discussion outlines the essential points of the analysis; the areas of disagreement with the opinion of the court are discussed in succeeding Parts.

First, Valdes made a "decision" -- or, even more clearly, took an "action." He decided to and did initiate WALES checks of the license plate numbers Blake gave him. He did the same regarding the name Blake gave him for the purpose of conducting a warrant search.

Second, the action that Valdes took was on a "question [or] matter." However vague those terms may be, there can be no dispute that a "matter" includes an "investigation." *See* Oral Arg. Tr. at 70-71 (concession by Valdes' counsel that a "matter" includes an "investigation"). Indeed, another section of the same chapter of the United States Code, which bars a former official from making appearances in connection with a "particular matter" in which the official had participated while in government, expressly defines "particular matter" as including "any investigation." 18 U.S.C. § 207(i)(3); *see also id.* § 205(h) (defining a "covered matter" under another Code provision, § 205, as including an "investigation").

Finally, an investigation is clearly a matter that "may at any time be pending, or [that] may by law be brought before" Valdes in his "official capacity [or] place of trust or profit." Valdes was a police detective whose job, by definition, was to conduct investigations. Indeed, in the document that Valdes signed to gain access to WALES, he stated that he intended to use the database to "conduct criminal investigations and background checks." J.E.A. 83; *see also* J.E.A. 84. And as noted above, when Valdes used WALES, he was using a restricted database to which he had access only by virtue of his status as a police officer.

Much of this is common ground, although the court reaches its conclusions by a different route. According to the court, "the words 'question' and 'matter' are known by the company that they keep," Court Op. at 9, and hence those more general terms must be interpreted to reflect the same "class of processes" as the other terms in the six-term series listed in the definition of official act, *id.* at 13. There is a reasonable argument that the series was instead intended to broaden the statutory definition, rather than to limit it. *See United States v. Valdes*, 437 F.3d 1276, 1284-85 (D.C. Cir. 2006) (Henderson, J., dissenting). But in any event, the court concedes that "a police investigation is in the same class of processes as a 'question, matter, cause, suit, proceeding, or controversy.'" Court Op. at 13. Thus, even on the court's view of the appropriate approach to interpreting subsection 201(a)(3), an investigation constitutes an "official act." *See id.* at 13.

The court further insists that the "six-term series refers to a class of questions or matters whose answer or disposition is determined by the government." *Id.* at 9. I am not certain what work this formulation performs beyond that already accomplished by the express requirement of subsection 201(a)(3) that the question or matter must be one that "may at

any time be pending, or [that] may by law be brought before any public official, in such official's official capacity." But even accepting the court's formulation, there is still no dispute as to the conclusion. As the court states: "'Should the police investigate this person?' . . . is clearly a question answered by the government." Court Op. at 13. And "[p]roviding or receiving gifts for, or because of, decisions to initiate, accelerate, retard, conclude, or skew [a police] investigation is unquestionably conduct prohibited by § 201." *Id*. at 13.

Having identified common ground, the next Part addresses the field of disagreement: whether there was sufficient evidence for a jury to find that Valdes' actions amounted to an investigation and therefore an official act.

II

Although the court and I agree that an investigation is an "official act" within the meaning of subsection 201(a)(3), the court holds that Valdes' conduct cannot -- as a matter of law -- constitute an investigation. That holding is untenable.

A

Viewing the "evidence in the light most favorable to the government" as we must, *United States v. Alexander*, 331 F.3d 116, 127 (D.C. Cir. 2003) (internal quotation marks omitted), the actions that Detective Valdes took in this case are the routine steps that police officers take in a wide variety of investigations. Running license plate numbers and checking for outstanding warrants provide important information about both suspects and witnesses, often helping the police to separate one from the other. That is why Valdes sought access to WALES in the first place -- to "conduct criminal investigations and background checks." J.E.A. 83. Indeed, the case law of the District of

8

Columbia is replete with references to the use of WALES for these and other investigative purposes.[3]

1. The court dismisses the acts taken by Valdes as the "ascertainment of answers" to a few questions, Court Op. at 14, and as "simple interrogative activity," *id*. at 18. But many police investigations are quite brief. A WALES search may take only a few minutes, yet in that interval it can eliminate a suspect or confirm that he is a fugitive.[4] Some investigations begin and end with a single step: the running of tags. That step may tell a traffic officer that the person he has stopped is wanted for a crime,[5] or that he is just a minister on his way to church. The brevity of an inquiry, and the limited number of steps required to achieve its object, cannot alone be enough -- certainly not as

---

[3]*See, e.g.*, *Hutchinson*, 408 F.3d at 797-802; *Dorman v. District of Columbia*, 888 F.2d 159, 160-61 (D.C. Cir. 1989); *Duggan v. District of Columbia*, 884 A.2d 661, 664 (D.C. 2005); *Thomas v. United States*, 731 A.2d 415, 418 (D.C. 1999); *Duncan v. United States*, 629 A.2d 1, 1 n.1 (D.C. 1993).

[4]*See, e.g.*, *Hutchinson*, 408 F.3d at 801 ("By confirming that Hutchinson either was or was not providing false identification information to the police, a 'WALES' check ultimately could assist Detective Hilliard in evaluating whether or not Hutchinson was the stabbing suspect."); *Thomas*, 731 A.2d at 418 (noting that the officer began to suspect that the defendant had falsified his identity after running a WALES check); *Duncan*, 629 A.2d at 1 n.1 (stating that a WALES check disclosed that the suspect's license had been suspended).

[5]*See, e.g.*, *Anderson v. Alameida*, 397 F.3d 1175, 1178 (9th Cir. 2005) (defendant placed "in custody as a fugitive from justice" after NCIC check revealed an outstanding arrest warrant); *Childress v. United States*, 381 A.2d 614, 616 (D.C. 1977) (defendant arrested after WALES check revealed outstanding warrant).

a matter of law -- to rule it out as an investigation covered by the statute.[6]

This analysis neither "disaggregate[s]" nor "generalize[s]" the steps taken in an investigation, nor does it require holding that "every question asked and answered" is an "action" on a "matter." Court Op. at 13, 14. If Valdes had been ordered by a superior officer to make the WALES inquiries he did, no one would doubt that he was conducting an "investigation." But if Valdes' conduct would constitute an official act under those circumstances, then the fact that he acted in response to an outsider's request rather than an instruction from a supervisor cannot save him: "official act" is defined in terms of a "decision or action," regardless of who requests it, and the statute only requires that the "decision or action" be on a "question [or] matter" that "*may* at any time be pending, or [that] *may* by law be brought before" him in his official capacity. 18 U.S.C. § 201(a)(3) (emphasis added). Moreover, no one -- neither the defendant nor the court -- disputes that an officer would be liable under section 201 if he accepted money as a reward for *not* running a WALES search on a driver's license during a traffic stop. *See* Oral Arg. Tr. at 12-13; Court Op. at 13.[7]

The court suggests that another flaw in the government's case is that Valdes' investigation did not involve "activity in the real world," that it was "imaginary," and that it was "a pure

---

[6]Moreover, the only reason that Valdes' conduct ended when it did was that the government arrested him. Valdes had shown no indication that he was unwilling to continue to conduct requested WALES searches -- or take other investigatory steps -- indefinitely.

[7]*Cf. United States v. Ahn*, 231 F.3d 26 (D.C. Cir. 2000) (upholding an MPD officer's guilty plea for accepting an illegal gratuity for not reporting illegal activity).

fiction." Court Op. at 14, 19. In one sense that is, of course, true. The case involved an undercover "sting" operation in which each of the players -- other than the defendant -- was indeed fictitious. But such operations are a staple of bribery prosecutions,[8] and the court takes pains to assure us that its decision will have "no effect on law enforcement's ability to conduct 'sting' operations," and that the fact that the case involved a sting is irrelevant to its analysis. Court Op. at 15.

Once the fact that the case involved a sting is removed from the equation, however, it is unclear what the court means when it says that "Valdes's queries belonged to no . . . active or incipient police investigation," *id.* at 14, that they did not amount to "some sort of government investigation," *id.*, and that the issue was "linked only by pure supposition to an imaginary future matter," *id.* at 19. The court does not attempt to define what would constitute an "investigation," saying only that the matter must be "at least nascent" and "the underlying issue [must have] surfaced to some degree." *Id.* at 19. But the matter before Valdes was more than nascent and had already surfaced. His conduct was not linked to an "imaginary future" investigation; it was itself an actual investigation. Valdes conducted a background investigation on five individuals. This was a matter that Blake actually "brought before" Valdes, that was "pending" before him in the present, and upon which he "act[ed]" in the present tense. 18 U.S.C. § 201(a)(3). With respect, it is the court and not the dissent that does "not define

---

[8] *See, e.g.*, *United States v. Washington*, 106 F.3d 983 (D.C. Cir. 1997) (bribe to police officer to provide "protection" for a fictitious drug dealer); *United States v. Neville*, 82 F.3d 1101 (D.C. Cir. 1996) (bribe to jail guard from a fictitious drug dealer); *United States v. Kelly*, 748 F.2d 691 (D.C. Cir. 1984) ("Abscam" case, involving bribe to congressman to introduce private immigration bill for fictitious alien).

the outer bounds of [its] theory."  Court Op. at 14; *see id.* at 19 ("Exactly how developed an issue must be before it qualifies as possibly pending or able to be brought by law is something we need not decide.").

In a related vein, the court argues that "the scenario presented to Valdes gave neither him, nor any other police officer, any reason for official investigation of the individuals for whom Blake sought license number or warrant information." *Id.* at 19.  But once the sting is removed from the scenario, it is clear that the reason there was no "reason" is that Valdes would not have investigated the license number holders but for Blake's unlawful request.  Removing such a case from the definition of "official act," however, strikes at the core of bribery prosecutions under subsection 201(b)(2)(A), which punishes public officials who take official acts that they would have no reason to take but for being influenced by the payment of a bribe.  If the court's argument were correct, successful bribery prosecutions under that provision -- which depend upon the same definition of "official act" as gratuity prosecutions -- would not be possible.

2.  Nor is there any doubt that the investigation undertaken by Valdes was a *police* investigation -- that is, an investigation undertaken by Valdes in his "official capacity."  18 U.S.C. § 201(a)(3).  At one point in its opinion, the court alludes to the practice of "moonlighting," *see* Court Op. at 11, a word of multiple connotations, not all of which are benign.[9]  But Valdes did not undertake his efforts for Blake outside the scope of his

---

[9]*Compare* Oxford English Dictionary Online, http://www.oed.com (defining "moonlighting" as "[t]he practice of doing paid work in addition to one's regular employment"), *with id.* (alternatively defining the term as "[t]he performance of an illicit action by night").

official employment. He did not merely "parallel[]" his "regular work," Court Op. at 14, by running down license plates and warrants during his off hours, traveling to multiple motor vehicles departments or courthouses to learn the information as a member of the general public would have to do. Instead, he conducted the searches on his police computer by accessing WALES, a database that he knew full well could be used only for official business. *See* J.E.A. 87 (Valdes' personal acknowledgment, on a WALES training questionnaire, that the "[u]se of the WALES and NCIC systems is for criminal Justice purpose[s]," and that "[i]mproper use or dissemination of information contained within these systems could result in," inter alia, criminal prosecution); J.E.A. 111 (recording of Valdes telling Blake that he could only run one search at a time "'cause they monitor this stuff"); sources cited *supra* note 1 (regulations restricting WALES to "official legitimate law enforcement purposes only" and warning MPD employees to "take extraordinary precautions to ensure that this information is not observable to unauthorized persons"). Indeed, a tape of a telephone call makes clear that Valdes spoke to Blake from the police department, while he was in the process of entering the license plate numbers into the computer (the clicks are audible). J.E.A. 127.

Moreover, the steps taken by Detective Valdes are not only the kinds of investigative steps that police officers legally take; they are also the kinds of investigations that criminals have paid police officers to take for their own illegal purposes. A drug crew may want to know, for example, whether cars that cruise its neighborhood belong to rival gang members -- or to undercover officers.[10] Its leaders may want to learn the home

---

[10]*See, e.g.*, *United States v. Sedoma*, 332 F.3d 20, 27-28 (1st Cir. 2003); *United States v. Herrera*, No. 04-10665, 2006 WL 684432, at *1 (5th Cir. Mar. 17, 2006).

addresses or identities of witnesses who could testify against them at a trial or before a grand jury.[11]  They may want to know whether they or their associates have outstanding warrants.[12]  And a gang interested in identity theft may simply want the names, addresses, Social Security numbers, and other personal identifiers that WALES and similar law enforcement databases hold.  *See supra* note 2 (listing personal data contained in WALES and associated databases).  Although it turns out that none of these were the motives of the "judge" in this case, Valdes could not have known that.  And in any event, the corruptness of the payor's or payee's motive is not an element of the gratuity offense.  *See Sun-Diamond*, 526 U.S. at 404-05.

3. Finally, I note the defendant's argument that his WALES searches cannot constitute an investigation because they yielded only publicly available information.  The court does not adopt that argument, and rightly so.  The argument fails for three reasons.

First, nothing in the statutory language requires that an "official act" involve information that is not otherwise publicly available.  And, in fact, many police investigations involve what might be called "public source" information: the observation of cars on public streets, the surveillance of suspects in public places, the inspection of trash cans at the curb, and the questioning of neighbors and other witnesses.  Although all these things can be done by private investigators, they are within the scope of section 201 when done by the police.

---

[11]*See, e.g.*, *Sedoma*, 332 F.3d at 22, 27; *Gordon v. Borough of Middlesex*, 632 A.2d 1276, 1278 (N.J. Super. Ct. App. Div. 1993).

[12]*See, e.g.*, *Herrera*, 2006 WL 684432, at *1; *United States v. Ruiz*, 905 F.2d 499, 502 (1st Cir. 1990).

Second, it is not at all certain that the information Blake gave Valdes was publicly available. Although Valdes contends that a private investigator could have obtained the home addresses of the license plate holders by going to Virginia's Department of Motor Vehicles, a federal statute suggests otherwise. *See* 18 U.S.C. § 2721 (limiting disclosure of personal information, such as drivers' addresses, contained in state motor vehicle records).[13]

Third, the information that Valdes disclosed was in fact "confidential" in a much more important sense. Valdes did not just advise Blake of the home addresses and warrant status of certain individuals: he told him *what the government's files held* on those subjects. *See, e.g.*, J.E.A. 127 (recording of Valdes notifying Blake that, *"[a]ccording to the NCIC check*, nothing comes back" with respect to the outstanding warrant (emphasis added)). That information is not available to an ordinary citizen or private investigator because WALES is accessible only to law enforcement officers on official business. *See* sources cited *supra* note 1. And knowing what the government's files say has a value of its own, beyond the mere efficiency of information acquisition. When a police officer stops a car in the District of Columbia, he can check the driver's status by accessing WALES; he cannot, however, drive down to Virginia or up to New York to check public records. For $450, Blake learned not just whether his "friend" had a warrant, but whether WALES

---

[13]Valdes contends that, because Blake said the holders owed him money, the data would have been available under a statutory exception for use "in anticipation of litigation." 18 U.S.C. § 2721(b)(4). But Blake did not mention litigation, and courts have read the exception narrowly. *See, e.g.*, *Wemhoff v. District of Columbia*, 887 A.2d 1004, 1011 (D.C. 2005) (holding that subsection (b)(4) can be invoked only when there is a bona fide investigation relating to actual or "likely" litigation).

would show that he had a warrant. Had Blake been a drug dealer in the District, this would have been uniquely valuable information: knowing that WALES did not show his "friend" was wanted would make that friend a better bet as a drug courier, since he would be less likely to be arrested and searched after a traffic stop.

In sum, there is no ground for excluding Valdes' investigation from the scope of the gratuity offense.

B

The court asserts that two precedents compel its conclusion that Valdes' conduct falls outside the coverage of subsection 201(c). Neither, however, supports that result.

1. In *United States v. Sun-Diamond Growers*, the Supreme Court reversed a trade association's conviction under subsection 201(c)(1)(A) for giving Agriculture Secretary Michael Espy illegal gratuities (including sports tickets, luggage, and meals). The trial judge had charged the jury that it could find the association guilty if it "provided Espy with unauthorized compensation simply because he held public office," and that the "government need not prove that the alleged gratuity was linked to a specific or identifiable official act or any act at all." 526 U.S. at 403. The Court held that the statutory phrase, "for or because of any official act performed or to be performed," means "for or because of some particular official act" and not "for or because of official acts in general." *Id.* at 406. Were that not the case, the Court said, the statute "would criminalize, for example, token gifts" given to officials "based on [their] official position[s] and not linked to any identifiable act." *Id*. at 406-07. These could include, the Court suggested, a sports jersey given to the President by an athletic team during a White House visit, a school cap given to the Education Secretary on the

occasion of his visit to a high school, or a complimentary lunch for the Agriculture Secretary in conjunction with his speech to a group of farmers. *Id.* Requiring the government to prove an identifiable act, the Court said, would prevent such results.

In dictum, the *Sun-Diamond* Court worried that an "identifiable act" requirement might still not wholly solve the problem, because such gifts could "be regarded as having been conferred, not only because of the official's position as President or Secretary," but also "for or because of" the official acts of receiving the sports team, visiting the high school, or speaking to the farmers. *Id*. at 407. "The answer to this objection," the Court said, is that those actions "are not 'official acts' within the meaning of the statute," which "defines 'official act' to mean 'any decision or action on any question, matter, cause suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any official, in such official's official capacity, or in such official's place of trust or profit.'" *Id.* (quoting 18 U.S.C. § 201(a)(3)).

Nothing in either *Sun-Diamond*'s holding (that an illegal gratuity conviction requires a connection between the gratuity and an identifiable act) or its dictum (that activities such as receiving a sports team, visiting a high school, or speaking to farmers do not constitute "official acts" within the meaning of the statute) precludes our finding sufficient evidence to support Valdes' conviction. There is certainly "music" in *Sun-Diamond* that reflects a desire to rein in the broad language of section 201 (though there is contrapuntal music in *United States v. Birdsall*, 233 U.S. 223, 230 (1914), as Judge Henderson has pointed out, *see Valdes*, 437 F.3d at 1284, 1287 n.10 (Henderson, J., dissenting)). The Supreme Court's preference for interpreting the statute as a "scalpel" rather than a "meat axe," cited in this court's opinion in the instant case, is one such melody. *Sun-Diamond*, 526 U.S. at 412, *quoted in* Court Op. at 8. But *Sun-*

*Diamond* did not suggest that such narrowing should be accomplished arbitrarily. Rather, as the Supreme Court said expressly, the way to appropriately accomplish that end is to require that the official's action fall within the statutory definition of "official act." "[W]hen the violation is linked to a particular 'official act,'" the Court said, "it is possible to eliminate the absurdities *through the definition of that term*." 526 U.S. at 408 (emphasis in original).

While it may be absurd to describe receiving a sports team or visiting a high school as an official act, there is no dispute that a police investigation can fairly be described in that way. Because the initiation of such an investigation is a "decision or action" on a "question [or] matter" that may "be pending, or . . . by law be brought before" a police detective in his "official capacity," the statutory "*definition of th[e] term*" "official act" eliminates any argument that Valdes' conduct falls outside the scope of section 201(c). Hence, affirming his conviction would be faithful to both the words and the music of the *Sun-Diamond* opinion.

2. The other precedent cited by the court is our own decision in *United States v. Muntain*, 610 F.2d 964 (D.C. Cir. 1979). The defendant in that case was a Department of Housing and Urban Development (HUD) official, who was convicted of accepting illegal gratuities for assisting his alleged co-conspirators in marketing private automobile insurance to labor unions. That assistance involved both Muntain's personal acts and his efforts to get his HUD subordinates to help him. As the court explained in reversing Muntain's conviction, the problem with the government's case was the absence of evidence suggesting "that automobile insurance as a benefit for labor unions fell within HUD's jurisdiction." *Id.* at 966. Because "promot[ing] group automobile insurance" did not "involv[e] a subject which could be brought before Muntain or, for that

matter, anyone else at HUD in an official capacity, [there was] no apparent danger that the receipt of gratuities . . . in connection with the group automobile insurance scheme would induce Muntain to act improperly in deciding a HUD-related matter." *Id.* at 968. The "determinative factor," we held, was "whether Muntain's actions" -- both personally and in directing his subordinates -- "involved a matter or issue that could properly, by law, be brought before him as an Assistant to the Secretary" of HUD. *Id*. at 969. "Since the promotion of group automobile insurance was not such a matter," we concluded "that no official act occurred and, hence, 18 U.S.C. § 201[(c)] cannot be invoked." *Id*.

*Muntain* reflects an important statutory limitation on the scope of the gratuity provision: the action at issue must involve a question or matter "which may at any time be pending, or which may by law be brought before" the defendant in his "official capacity." 18 U.S.C. § 201(a)(3). That limitation is satisfied here. Valdes was a police detective, and the kind of matter involved in this case -- a police investigation -- unquestionably could have been pending or brought before him in his official capacity. Accordingly, neither *Muntain* nor any other case supports the result that the court reaches today.

### III

My conclusion that there was sufficient evidence for a reasonable jury to find that Valdes' conduct constituted an investigation, and hence an official act, is sufficient to end my analysis of this issue. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (holding that evidence is sufficient to sustain a verdict if "*any* rational trier of fact could have found the

essential elements of the crime beyond a reasonable doubt").[14]
The court, by contrast, must go further. Because it concludes
that Valdes' conduct did not constitute an investigation, it must
go on to consider whether that conduct -- viewed simply as an
information disclosure -- nonetheless falls within the compass
of "official act." Although I do not need to decide that question,
I am compelled to address troubling aspects of the court's
analysis.

A

According to the court, "[e]xcept in limited circumstances"
like those involving formal procedures established by the
Freedom of Information Act (FOIA), "we do not believe that a
release of information can constitute a 'decision or action on any
question, matter, cause, suit, proceeding, or controversy.'"
Court Op. at 20 (quoting 18 U.S.C. § 201(a)(3)); *see id.* at 20-
21.[15] Hence, under the court's interpretation, if a drug dealer
were to reward Valdes for providing him with the names, home
addresses, and Social Security numbers of government
witnesses, taking (or giving) the money would not constitute an
unlawful gratuity -- unless the dealer also filed a FOIA request.
The same would be true if an identity thief (or a commercial
enterprise seeking to augment its customer list[16]) paid Valdes for

---

[14]I address the separate issue of the erroneous jury instruction in
Part IV.

[15]*See also* Court Op. at 15 ("Even if Blake had sought license
plate and warrant information about *real* people, that fact would not
have transformed his five questions, or Valdes's answers, or both, into
. . . any . . . kind of 'matter,' etc., covered by § 201(a)(3).")

[16]*Cf. Parks v. United States*, 355 F.2d 167, 169 (5th Cir. 1965)
(affirming bribery conviction for influencing an Air Force sergeant "to
sell the names of the recruits which were in his custody and control"

providing such information.  The same would be true if Valdes were paid for running DNA or fingerprint checks.   And the same would be true if a drug company, rather than a drug dealer, rewarded an FDA scientist for disclosing confidential information about the agency's plans for approving the company's drugs.

The court consoles us with the possibility that, under such circumstances, Valdes' information disclosure might violate one of an array of specific non-disclosure statutes.  (It would not, however, violate the drug laws if Valdes did not know why the drug dealer wanted the information.)  In fact, it is not at all clear that any of the criminal statutes cited by the court, *see* Court Op. at 11, 21, would apply to Valdes' situation; and it is extremely doubtful that any would apply to the private citizen who paid him the money.  But even if a non-disclosure statute did apply, the court correctly concedes that the possibility that Valdes violated another statute "implies nothing direct about his culpability under § 201." *Id.* at 11.  Congress may well -- and often does -- proscribe the same conduct in multiple statutes. *See United States v. Williams*, 216 F.3d 1099, 1102 (D.C. Cir. 2000) ("It is not uncommon for laws to be cumulative.").  And it would be neither troubling nor surprising if section 201 punished the disclosure of information for pay more severely than other laws punished the mere disclosure alone.  Disclosing information for pay adds a level of venality that the legislature is certainly warranted in punishing with greater severity.

The court also consoles us with the possibility that, if Valdes took money offered *to induce* him to provide confidential information, that "might qualify as [an act] 'in violation of the official duty'" of a public official.  Court Op. at 21.  If it did so qualify, Valdes' conduct might violate a different

to a life insurance salesman).

subsection of the bribery statute, subsection 201(b)(2)(C), which punishes a public official for corruptly accepting payment in return for "being induced to do . . . any act in violation of [his] official duty." That possibility is not much consolation.

First, this circuit has never had occasion to construe the meaning of "official duty" under subsection 201(b)(2)(C), let alone to explain how it differs from the meaning of "official act" under subsection 201(b)(2)(A).[17] Nor are the varying explanations offered by other circuits particularly helpful.[18] The court thus holds out the possibility of a bribery prosecution

---

[17]In relevant part, subsection 201(b)(2) states that whoever,

> being a public official . . . directly or indirectly, corruptly . . . accepts . . . anything of value . . . in return for: (A) being influenced in the performance of any *official act*; . . . [or] (C) being induced to do or to omit to do any act in violation of the *official duty* of such official or person; . . . shall be fined . . . or imprisoned . . . or both. . . .

18 U.S.C. § 201(b)(2) (emphasis added).

[18]Indeed, the principal case cited by the court, *Parks v. United States*, 355 F.2d at 168-69, holds that *both* the "official duty" *and* the "official act" provisions cover the case of an Air Force sergeant who sells the names of new recruits to an insurance salesman -- a view of the statute that is directly contrary to that taken by the court today. *See also United States v. Parker*, 133 F.3d 322, 325-26 (5th Cir. 1998) (interpreting "[a]cts that violate an official's duty" as a subset of "official act[s]"); *United States v. Alfisi*, 308 F.3d 144, 151 n.3 (2d Cir. 2002) ("Subsections (A) and (C) undoubtedly overlap in some considerable measure, although resort to (A) seems most appropriate in the case of bribes regarding decisions involving the exercise of judgment or discretion, . . . while use of (C) would be most appropriate in the case of bribes to induce actions that directly violate a specific duty.").

under a subsection of uncertain meaning, while eliminating the possibility of such a prosecution under subsection 201(b)(2)(A).[19] The court's analysis eliminates the latter possibility because, if it is not a gratuity in violation of subsection 201(c)(1)(B) for Valdes to accept money from a drug dealer "for or because" he conducted the WALES searches, it cannot be bribery in violation of subsection 201(b)(2)(A) even if that money "influence[s]" him to conduct those searches. That is so because both subsections 201(c)(1)(B) and (b)(2)(A) require an "official act," and because both rely on the same definition of that term. *See* 18 U.S.C. § 201(a)(3). Indeed, on the court's analysis, it cannot even be bribery under section 201(b)(1)(A) for the *drug dealer* to pay to influence the detective to conduct such searches.

Second, the principal problem with the court's decision is not that it will permit criminals to *bribe* our public officials, but that it will permit them to *reward* those officials. Even if the "official duty" subsection of the bribery statute (§ 201(b)(2)(C)) does apply to a payment intended to induce disclosure of confidential government information, that subsection (unlike § 201(b)(2)(A)) has no parallel in the gratuities subsection (§ 201(c)(1)). Hence, if a public official is paid cash as an after-the-fact "reward" -- not as an "inducement" -- for disclosing confidential information, the payment is not unlawful under the court's analysis. *See Sun-Diamond*, 526 U.S. at 404-05

---

[19]*See, e.g.*, *United States v. Sutton*, 801 F.2d 1346 (D.C. Cir. 1986) (conviction under "official act" prong of bribery statute based in part on payment for disclosure of confidential information regarding Department of Energy settlement negotiations); *Parks*, 355 F.2d at 169 (upholding bribery conviction for paying an Air Force sergeant to sell names of new recruits, because the payment was made "with intent to influence his . . . action on any . . . matter . . . pending . . . before him" (omissions in original)).

(explaining that "for bribery there must be a *quid pro quo*," while an "illegal gratuity . . . may constitute merely a reward for some future act . . . or for a past act that [the official] has already taken"). That is true for all of the "rewards" described above -- ranging from one paid to a detective by an identity thief or drug dealer, to one paid to an FDA scientist by a drug company.

Although the court is correct in noting that the bribery provision covers more "predicate acts" than the gratuity provision, it has no warrant for concluding that applying the latter to Valdes' conduct would disturb a "kind of balance" chosen by Congress. Court Op. at 16; *see id*. at 16-18. There is certainly nothing in the legislative history to suggest that Congress intended the gratuity predicate to be so narrow as to exclude conduct like that of Valdes, or like that of the identity thief, drug dealer, or drug company noted above. Although the court is correct in saying that it "is the corruption of official decisions through the misuse of *influence* in governmental decision-making which the *bribery* statute makes criminal," *id.* at 10 (quoting *Muntain*, 610 F.2d at 968 (emphasis added)), the *gratuity* provision reaches further to prevent the creeping corruption that may arise as the result of giving or receiving rewards for official acts. As the House Report accompanying the passage of the current statute explained, the "conduct which is forbidden" by the gratuity provision "has the appearance of evil and the capacity of serving as a cover for evil." H.R. Rep. No. 87-748, at 19 (1961). Defining that provision so narrowly as to preclude prosecution of information disclosure except in FOIA cases contravenes congressional intent and eliminates an important tool routinely used by prosecutors to fight public corruption.[20]

---

[20]*See, e.g.*, *United States v. Gaines*, Nos. 92-5446, 92-5501, 1993 WL 220206 (4th Cir. June 23, 1993) (illegal gratuities conviction, in which the official acts were the supplying of "confidential, sensitive,

Third, the court's disposition of this question does public officials no favor. Because the court's opinion makes it impossible for a prosecutor to charge, or the jury to settle upon, a lesser included offense for conduct that most people would consider criminal, it makes it more likely that those who undertake such conduct will be charged with and convicted of the greater offense of bribery.[21] Indeed, Valdes -- who the jury acquitted of the greater offense but convicted of the lesser -- may well have been the beneficiary of such a resolution, the possibility of which the court now takes off the table.

B

There is nothing in the plain language of subsection 201(a)(3)'s definition of official act that precludes it from encompassing the disclosure of an agency's -- or the nation's --

---

and classified" Navy information to defense contractors); *United States v. Greenberg*, 444 F.2d 369 (2d Cir. 1971) (illegal gratuity conviction in a sting operation, where the official act was providing information concerning an IRS investigation); *United States v. Viviano*, 437 F.2d 295 (2d Cir. 1971) (conviction in a sting operation for offering a gratuity for confidential information from IRS files).

[21]*See Keeble v. United States*, 412 U.S. 205, 212-13 (1973) ("[I]t is no answer to petitioner's demand for a jury instruction on a lesser offense to argue that a defendant may be better off without such an instruction. True, if the prosecution has not established beyond a reasonable doubt every element of the offense charged, and if no lesser offense instruction is offered, the jury must, as a theoretical matter, return a verdict of acquittal. But a defendant is entitled to a lesser offense instruction . . . precisely because he should not be exposed to the substantial risk that the jury's practice will diverge from theory. Where one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of some offense, the jury is likely to resolve its doubts in favor of conviction.").

secrets for pay. Whether to disclose such information can reasonably be viewed as a "decision or action" on a "question [or] matter" that "may by law be brought before any public official, in such official's official capacity." The court rightly warns that "*every* question-and-answer between an official and a citizen can[not] be brought within the statute." Court Op. at 21. I certainly agree that the term "question" does not encompass any sentence that ends in a question mark. Instead, as *Muntain* indicates, the types of "questions" covered by section 201 are those that may be "pending" or "may by law be brought before" the defendant public official. *See* 610 F.2d at 969. But there is no reason why we must conclude that Valdes' conduct in this case did not constitute an action on just such a "question." To find Valdes' conduct covered by the statute is not to work a "[j]udicial extension" of the congressional text, Court Op. at 18; rather, the court's contrary holding effects a judicial contraction.

The court reaches this result because, in my view, it misconstrues the "question" that is actually at issue in Valdes' case. The "question" is not, as the court suggests in referring to Blake's request for the name of the license holder: "What is your name?" or "Where do you live?" Court Op. at 9, 12. Rather, the question is: "*What do the government's files show* is the name and address?" That is a question that was "pending" and "brought before [a] public official," namely Valdes. And because access to WALES is restricted to law enforcement personnel, it is a question that Valdes could answer only in his "official capacity, or in [his] place of trust or profit." In the court's own formulation, that question -- What do the government's files show? -- is a "[q]uestion[] . . . subject to resolution by the government." Court Op. at 9. Indeed, just as "'Should the police investigate this person?' . . . is clearly a question answered by the government," *id.* at 13, so too is

"Should the police disclose the contents of law enforcement computer files?"

None of this conflicts with the dictum of *Sun-Diamond*. As discussed in Part II.B.1 above, that dictum was aimed, as the Court itself said, at preventing absurdities from becoming gratuities -- absurdities like the gift of a jersey for receiving a sports team at the White House, or the gift of a cap for visiting a high school. But there is nothing absurd about barring a government official from taking cash as a reward for disclosing the contents of restricted files. We should not, and we need not, foreclose the prosecution of such behavior by the manner in which we decide this case.

IV

Finally, I agree with my colleagues that the district judge's jury instruction on the definition of "official act" was error. Court Op. at 12-13. The judge refused the defendant's request to include the statutory definition set out in subsection 201(a)(3), and instead instructed the jury that "the term official act means any decision or action within the scope of the public official's authority." J.A. 721. That refusal conflicts with *Sun-Diamond*'s directive to focus on "*the definition of [official act]*," 526 U.S. at 408 (emphasis in original), and the court is right in holding that the government cannot satisfy its burden of showing that the error was harmless, Court Op. at 13; *cf. Sun-Diamond*, 526 U.S. at 412-14 (rejecting a claim that an erroneous jury instruction concerning the scope of subsection 201(c) was harmless).

But my colleagues' conclusion that the jury instruction was error is without consequence to their analysis. Because they hold that no reasonable jury could have found Valdes' conduct to constitute an official act, no jury instruction could have saved the conviction, and the case against him must be dismissed. For

me, by contrast, the error is of consequence. Because it was not harmless, the judgment must be reversed. But because I regard the evidence as sufficient for a properly instructed jury to convict Valdes of accepting an illegal gratuity, I would remand the case for a new trial.

V

In a well-intentioned effort to avoid reading section 201 so broadly as to include the absurdities described in the *Sun-Diamond* dictum, the court has denied the government an important weapon in fighting official corruption. It is one thing to interpret section 201 as a "scalpel" rather than a "meat axe." Court Op. at 8 (quoting *Sun-Diamond*, 526 U.S. at 412). It is quite another to turn the scalpel on the statute itself. Because today's decision has that unintended consequence, I respectfully dissent.